730 P.2d 470

**Robert Lee CANDELARIA,**
**Plaintiff-Appellee,**

v.

**GENERAL ELECTRIC COMPANY, a corporation, Employer, and Electric Mutual Insurance Company, Insurer, Defendants-Appellants.**

**No. 7841.**

Court of Appeals of New Mexico.

Feb. 13, 1986.

Certiorari Quashed Dec. 17, 1986.

Pedro G. Rael, Rael & Jarner, Los Lunas, Thomas A. Tabet, Albuquerque, for plaintiff-appellee.

Kathryn Levy, Paul L. Civerolo, Civerolo, Hansen & Wolf, P.A., Albuquerque, for defendants-appellants.

## OPINION

ALARID, Judge.

Defendants appeal from the judgment of the district court in favor of Robert Lee Candelaria (plaintiff). This appeal raises issues of first impression: whether and under what circumstances psychological disability predicated upon psychological injury that arises from work-related stress is compensable under the New Mexico Workmen's Compensation Act (Act), NMSA 1978, Sections 52–1–1 to –69 (Orig.Pamp. and Cum.Supp.1985). Defendants also appeal the trial court's failure to grant post-judgment relief, the amount of attorneys' fees awarded, and the award of interest on the judgment. We affirm.

## FACTS

Plaintiff is forty-three years old and has been married for seven years. He has a high school education and was in the service for three years. He testified that he had no problems in the service and was honorably discharged. He then began to work as a "plater." Eventually, he became a foreman supervising platers and later became a plant manager overseeing a substantial number of employees. He held this position for thirteen or fourteen years until, in 1977, the owner sold the plant, leaving plaintiff without a job. Plaintiff came to New Mexico to look for work and had to settle for a janitor job. Subsequently, plaintiff worked as a laborer and for a company making roof trusses. He testified that he had no problems with these jobs and had no clashes with his supervisors. Plaintiff then went to work for General Electric (G.E.), as a janitor, hoping that he could advance to a plating job.

Plaintiff first worked as a janitor at G.E., but soon became a forklift operator. Thereafter, he began to work as a "process varied" preparing jet engine parts for plating. According to plaintiff, he had no emotional difficulties with his supervisors during this period of time. At first, plaintiff worked during the night shift under Gianini for a period of between six months and a year. Plaintiff testified that except for one instance where he had refused to take a shortcut requested by Gianini, he had no problems while he worked the night shift.

Plaintiff described the process of his work. Basically, he prepared various components of jet engines for plating. The parts would be cleaned and then placed in acid, cleanser chemical or plating baths for various periods of time. A timer would go off when the part was to be removed from the bath. More than one part would be going through this process at any given time. Plaintiff testified that this was a full-time job.

Plaintiff's problems began when he was transferred to the day shift and began working under the supervision of Jewett. At first, plaintiff had basically the same job. After a few weeks, however, Jewett began to assign more duties to plaintiff. An employee with a different job classification quit, and plaintiff was required to perform this employee's job in addition to his own. Plaintiff testified that he received no help from other employees in performing these additional tasks. The performance of these additional tasks was complicated by the fact that parts were being timed while plaintiff was doing these tasks and by the fact that Jewett would tell plaintiff to drop everything in order to work on the "hot" (priority) items.

Plaintiff complained to Jewett, but was told that he had to do the work assigned to him. Plaintiff then went to the union and various plant officials, but nothing was done. Plaintiff then went to the Labor Board, but was told to talk to the plant manager. Plaintiff did talk to the plant manager and was told a new worker would be hired in three weeks. Three weeks passed, and no new worker was hired.

On or about May 13, 1981, plaintiff again went to see the plant manager. The manager said he had been too busy and needed additional time. Plaintiff returned to his work station and was told to go outside to steam clean some parts. Plaintiff felt nervous. Jewett came outside and started giving plaintiff more orders. Plaintiff started shaking and felt like killing Jewett. Plaintiff formed an intent to kill Jewett but changed his mind. Plaintiff ran inside the building; he was crying, sweating and had chest pains. Plaintiff went home where he was later found by his wife still crying and shaking. His wife called the family doctor.

A series of hospitalizations began for psychological problems. First, plaintiff was hospitalized for three months at Vista Sandia on a voluntary basis. He then returned to G.E., was again placed under Jewett and asked to perform the same tasks. Soon, plaintiff was suffering from nervousness, sweating and chest pain. He was again hospitalized at Vista Sandia for three months. Plaintiff returned to work at G.E., again was placed under Jewett and asked to perform the same tasks. Accord-

ing to plaintiff, "Jewett didn't slack off one bit." Plaintiff had a nervous breakdown and was again hospitalized at Vista Sandia. This happened again and again for a total of four times. Plaintiff told officials at G.E. that he would work as a janitor, if necessary, if they would not place him under Jewett again. After the fourth hospitalization, plaintiff was finally placed under another supervisor. However, after attending a deposition, plaintiff saw Jewett, got chest pains and began to hyperventilate. He was then hospitalized for the fifth time in January 1983.

Dr. Gerard S. Fredman, a psychiatrist, testified that plaintiff was suffering from anxiety and depression disorders, and from paranoid ideations. The symptoms of anxiety and depression were severe. Dr. Fredman concluded that events at work had triggered the symptom formation. Dr. Fredman believed that plaintiff's problems arose from the fact that he could not cope with work. The doctor testified that to a reasonable degree of medical probability, plaintiff's disability was stimulated by the conflict with Jewett and by plaintiff's interpretation of that conflict. Dr. Fredman stated that there were things in plaintiff's history that could have predisposed him to the breakdown.

Dr. Fredman attached critical significance to the conflict with Jewett because plaintiff had done well in other settings. Dr. Fredman also evaluated the possibility that plaintiff was malingering. He concluded that plaintiff was not malingering because the physical symptoms were too sophisticated to fake, because plaintiff had made a genuine (as opposed to an attention-getting) suicide attempt, and because plaintiff had made diligent attempts to return to work.

More medical testimony was provided by Dr. Stephen I. Sacks, another psychiatrist. Dr. Sacks' deposition was read into the record. Dr. Sacks diagnosed plaintiff as suffering from affective or mood disorders involving anxiety and depression. He believed that these disorders were a reaction to the stress at work. Dr. Sacks stated that he was unable to identify any source of plaintiff's disability other than the stress at work.

Dr. Paul Rodriguez, a clinical psychologist, testified for defendants. After administering psychological tests to plaintiff, Dr. Rodriguez concluded that plaintiff had a "schizotypical" personality. Dr. Rodriguez found it difficult to believe that plaintiff's problems were caused by the particular job situation at G.E. because a schizotypical personality is a long-standing problem. However, Dr. Rodriguez refused to say whether the work situation at G.E. aggravated any pre-existing problems because he had insufficient information as to plaintiff's history.

On cross-examination, Dr. Rodriguez was asked a long, hypothetical question in which he was asked to assume, among other things, that plaintiff had no prior difficulties in other settings, was under stress at work and had a nervous breakdown after a confrontation with his foreman. Dr. Rodriguez admitted that, if all the facts in the hypothetical were true, the work situation may have aggravated plaintiff's problems.

After trial, the court found plaintiff to be temporarily totally disabled from May 13, 1981 to January 28, 1983, and permanently partially (25%) disabled thereafter. The trial court found that an accidental injury took place on May 13, 1981, and before each subsequent hospitalization.

## DISCUSSION

### I. COMPENSABILITY OF PSYCHOLOGICAL INJURY CAUSED BY EMOTIONAL STRESS

#### A. Recognition of the Cause of Action

Defendants' arguments on appeal are related to the issue of whether a workman may recover compensation benefits where he has sustained disability predicated upon a psychological injury, caused by emotional stress, which is unrelated to any accompanying physical injury. Although this question has been raised previously in this jurisdiction, recovery has been denied based upon the facts of each particular case. *See*

*Kern v. Ideal Basic Industries,* 101 N.M. 801, 689 P.2d 1272 (Ct.App.1984) (a mental breakdown suffered as a result of termination was not an injury "arising out of" employment because it was not related to the performance of the employee's employment duties). No case has held or suggested that a psychological injury caused by stress arising out of and in the course of employment would not be compensable.

There is a divergence of opinion as to whether workmen's compensation benefits are payable due to the disability or death of a workman caused by shock, excitement or emotional disturbance unaccompanied by physical impact or violence on the workman's body. *See e.g. State Compensation Fund v. Industrial Commission,* 24 Ariz. App. 31, 535 P.2d 623 (1975) (mental or emotional shock resulting in disability is compensable without physical injury); *Burlington Mills Corp. v. Hagood,* 177 Va. 204, 13 S.E.2d 291 (1941) (recognizing recovery without physical impact). *Contra In re Loague,* 450 P.2d 492 (Okla.1969); *In re Korsun's Case,* 354 Mass. 124, 235 N.E.2d 814 (1968); *Samolin v. Trans World Airlines, Inc.,* 20 App.Div.2d 160, 245 N.Y.S.2d 628 (1963); *Liscio v. S. Makransky & Sons,* 147 Pa.Super. 483, 24 A.2d 136 (1942).

A "distinct majority" of out-of-state courts have held that an emotional or mental stimulus can produce a compensable "nervous" injury. 1B A. Larson, *Workmen's Compensation Law,* § 42.23 (1985). *See e.g. American National Red Cross v. Hagen,* 327 F.2d 559 (7th Cir.1964); *Carter v. General Motors Corp.,* 361 Mich. 577, 106 N.W.2d 105 (1960); *Wolfe v. Sibley, Lindsay & Curr Co.,* 36 N.Y.2d 505, 369 N.Y.S.2d 637, 330 N.E.2d 603 (1975); *Bailey v. American General Insurance Co.,* 154 Tex. 430, 279 S.W.2d 315 (1955). *See also* Annot., 97 A.L.R.3d 161 (1980 & Supp. 1985). A substantial number of courts, however, still deny recovery in these cases. *Id. See e.g. Jacobs v. Goodyear Tire & Rubber Co.,* 196 Kan. 613, 412 P.2d 986 (1966); *Johnson v. Hartford Accident & Indemnity Co.,* 196 So.2d 635 (La.App. 1967); *Vernon v. Seven-Eleven Stores,* 547 P.2d 1300 (Okla.1976). The majority of courts that have dealt with the question have held that this emotional or mental stimulus may be gradual. Larson, *supra,* § 42.23(b). *See e.g. American National Red Cross; Carter.*

■ New Mexico law points us in the direction toward recognizing that an emotional or mental stimulus can produce a compensable psychological injury. In a series of cases involving physical injuries at the workplace, the supreme court has held that a resulting psychological disability is compensable. *Webb v. Hamilton,* 78 N.M. 647, 436 P.2d 507 (1968), *overruled on other grounds, American Tank & Steel Corp. v. Thompson,* 90 N.M. 513, 565 P.2d 1030 (1977); *Ross v. Sayers Well Servicing Co.,* 76 N.M. 321, 414 P.2d 679 (1966); *Jensen v. United Perlite Corp.,* 76 N.M. 384, 415 P.2d 356 (1966), *overruled on other grounds, American Tank & Steel Corp.; Gonzales v. Gackle Drilling Co.,* 70 N.M. 131, 371 P.2d 605 (1962). In a series of cases involving physical disabilities, both the supreme court and this court have held that an injury caused by emotional stress at work is compensable. *Salazar v. County of Bernalillo,* 69 N.M. 464, 368 P.2d 141 (1962) (cerebral hemorrhage caused by stressful events at work); *Little v. J. Korber & Co.,* 71 N.M. 294, 378 P.2d 119 (1963) (emotional upset at work caused heart attack); *Crane v. San Juan County, New Mexico,* 100 N.M. 600, 673 P.2d 1333 (Ct.App.1983) (work stress caused high blood pressure which caused hemorrhage in eye). Thus, existing case law has established that a psychological disability is a "disability" within the meaning of the Act, and that physical disabilities resulting from work-related emotional stress are compensable. If both physical trauma leading to psychological disability, and emotional stress, leading to physical disability are compensable, it follows that emotional stress leading to psychological disability comes within the Act. We hold that a psychological disability caused by stress arising out of and in the course of employment is compensable. *See Townsend v.*

*Maine Bureau of Public Safety*, 404 A.2d 1014 (Me.1979).

■ Implicit in our holding is the recognition that a gradual, non-traumatic emotional condition arising from stress may be an accidental injury under Section 52–1–28 of the Act. This section makes "an accidental injury arising out of, and in the course of * * * employment" a pre-condition to coverage. *Id.* The language makes no distinction between physical and mental injuries. An accidental injury is merely an unlooked-for mishap, or untoward event, that is not expected or designed. *Bufalino v. Safeway Stores, Inc.*, 98 N.M. 560, 650 P.2d 844 (Ct.App.1982). An accident is not limited to a sudden injury, nor is it limited to any time test. *Gilbert v. E.B. Law & Son, Inc.*, 60 N.M. 101, 287 P.2d 992 (1955). Such injury, moreover, may be produced gradually and progressively. *Webb v. New Mexico Publishing Co.*, 47 N.M. 279, 141 P.2d 333 (1943). The statutory language does not operate to bar an emotional condition arising from stress.

The language serves as a reflection of the basic purpose of the Act, which is to ensure that industry carry the burden of personal injuries suffered by workmen in the course of their employment. *Gonzales v. Chino Copper Co.*, 29 N.M. 228, 222 P. 903 (1924); *Casillas v. S.W.I.G.*, 96 N.M. 84, 628 P.2d 329 (Ct.App.1981). Our inclusion of a gradual, non-traumatic emotional injury does no more than track that purpose. In *Royal State National Insurance Co. v. Labor and Industrial Relations Appeal Board*, 53 Haw. 32, 487 P.2d 278 (1971), the Hawaii Supreme Court eloquently articulated why this is so. That court interpreted "accidental injury" in a statutory provision similar to Section 52–1–28, and concluded:

> HRS [Hawaii Revised Statutes] § 386–3 makes no differentiation between organic and psychic injuries arising out of the employment relationship and we do not believe this court should impose such a distinction. The legislature has chosen to treat work-related injuries as a cost of production to be borne by industry and, ultimately, through the consumption process, by the community in general. (Citation omitted). In today's highly competitive world it cannot be doubted that people often succumb to mental pressures resulting from their employment. These disabilities are as much a cost of the production process as physical injuries. The humanitarian purposes of the Workmen's Compensation Law require that indemnification be predicated not upon the label assigned to the injury received, but upon the employee's inability to work because of impairments flowing from the conditions of his employment.

*Id.* at 38, 487 P.2d at 282 (citation omitted). *See also* Annot., 97 A.L.R.3d at 168–69.

Defendants are in error, therefore, when they assert that plaintiff suffered no accidental injury. Substantial evidence supported the trial court in finding that an accidental injury took place on May 13, 1981 (the first hospitalization), and before each subsequent hospitalization.

### B. "Arising Out of" Employment

Our holding, however, raises other issues argued on appeal. We must, in recognizing a new basis for recovery, determine what is required for the psychological injury to "arise out of" the particular employment. Section 52–1–28. We first discuss the "arising out of" component in New Mexico and its relationship to the present case. We next discuss the approach of other jurisdictions, and the approach we will adopt.

■ It is unnecessary that a workman be subjected to an unusual or extraordinary condition for an injury to be compensable. *See, e.g., Lyon v. Catron County Commissioners*, 81 N.M. 120, 464 P.2d 410 (Ct.App.1969); *Webb v. New Mexico Publishing Co.; Alspaugh v. Mountain States Mutual Casualty Co.*, 66 N.M. 126, 343 P.2d 697 (1959). In order to arise out of employment, an injury need only be causally related to the performance of the job duties. *See Wilson v. Richardson Ford Sales, Inc.*, 97 N.M. 226, 638 P.2d 1071

(1981). In New Mexico, however, it is not sufficient that the injury occurs at work; the disability must have resulted from a "risk incident to work itself" or "increased by the circumstances of the employment." *Kern*, 101 N.M. at 802, 684 P.2d at 1273.

To the extent, therefore, that plaintiff's disability was due to stress associated with the performance of his work duties, it "arose out of" his employment. *Salazar v. County of Bernalillo; Little v. J. Korber & Co.; Crane v. San Juan County.* Whether plaintiff's stress, resulting from the conflicts with Jewett, arose out of the employment depends upon whether the conflicts were related to work. *Cf. Perez v. Fred Harvey, Inc.*, 54 N.M. 339, 224 P.2d 524 (1950) (jury question whether shooting by fellow employee was personally motivated or motivated by work-related quarrel). Jewett denied any conflict with plaintiff. Plaintiff's testimony, set forth above, was that the conflict arose from Jewett's assignment of work duties. Plaintiff's testimony was substantial evidence that the stresses identified by Drs. Fredman and Sacks as the cause of the disability did arise from plaintiff's employment.

Certain jurisdictions have expressed concern over applying the normal interpretation of "arising out of" to cases involving gradual psychological injury. This concern grows out of the traditional reluctance of courts to allow recovery for any mental suffering unaccompanied by physical impact or injury. The reluctance is based on a fear of fraudulent claims and the lack of judicial expertise for evaluating injury unaccompanied by observable physical manifestations. *See Townsend.* Where a psychological injury "occurs rapidly and can be readily traced to a specific event * * * there is a sufficient badge of reliability to assuage [any] Court's apprehension. Where, however, a mental injury develops gradually and is linked to no particular incident, the risk of groundless claims looms large indeed." *Id.*, 404 A.2d at 1018.

As a response to the difficulties inherent in the evaluation of psychological injury, the Supreme Court of Wisconsin, in *School District #1 v. Department of Industry, Labor & Human Relations*, 62 Wis.2d 370, 377, 215 N.W.2d 373, 377 (1974), enunciated the following interpretation of "arise out of" employment:

> [I]t is the opinion of this court that mental injury non-traumatically caused must have resulted from a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience. Only if the "fortuitous event unexpected and unforeseen" can be said to be so out of the ordinary from the countless emotional strains and differences that employees encounter daily without serious mental injury will liability * * * be found.

The plaintiff in *School District* was employed as a school guidance counselor. She received a list of recommendations from high school students that asked for the removal of several staff members, including herself. The Department of Industry found that receipt of this list, and conversations with students concerning the list, constituted the accident "arising out of" plaintiff's employment which caused subsequent "acute anxiety reaction" and resulting disability. *Id.* at 372–373, 215 N.W.2d at 374–375. The court, however, after formulating its interpretation of "arise out of", concluded that the receipt of the list "could not be deemed to be so out of the ordinary from the countless emotional strains and differences that employees encounter daily without serious mental injury." 60 Wis.2d at 378, 215 N.W.2d at 377. Her application for compensation was dismissed.

Arkansas, Rhode Island and Wyoming have adopted the *School District* interpretation of "arising out of". *See Owens v. National Health Laboratories*, 8 Ark.App. 92, 648 S.W.2d 829 (1983); *Seitz v. L & R Industries, Inc., etc.*, 437 A.2d 1345 (R.I. 1981); *Consolidated Freightways v. Drake*, 678 P.2d 874 (Wyo.1984). Defendants ask this court to adopt *School District* and overrule the trial court on that basis.

In *Townsend*, the Supreme Court of Maine modified *School District* because it perceived a problem with its application.

The *Townsend* court announced the following standard:

> While this rule [in *School District*] would be appropriate in the vast majority of gradual mental injury cases, it would not compensate an individual who, for example, developed a psychological disability resulting from the simple day-to-day stresses of an assembly line * * *. Our Act, however, is not merely objective covering the average person; it is also subjective and protects even the eggshell. With adequate safeguards to shield the employer, even those predisposed to mental injury should be able to recover for ordinary work-related stress to which others would not succumb. We conclude that ordinary work-related stress and strain could be compensable if it were shown by clear and convincing evidence that the trauma generated by the employment predominated in producing the resulting injury. [Footnote omitted.] Any less showing, however, would be insufficient adequately to protect an employer.

404 A.2d at 1019–20.

*Townsend* recognized the higher level of stress required under *School District* for most cases but, at the same time, permitted a subjective standard for the measurement of stress designed to protect those workers predisposed to mental injury.

Another group of jurisdictions allow compensation based on a gradual mental injury resulting from day-to-day work-related stress without the higher standard of proof imposed in *Townsend. Baker v. Workmen's Compensation Appeals Board,* 18 Cal.App.3d 852, 96 Cal.Rptr. 279 (1971); *Royal State; Carter.* This approach is premised on the view that the basic purpose of a worker's compensation system mandates that a worker disabled as a result of work-related stress receive treatment identical to a worker disabled by a work-related physical injury. *Carter.*

We realize the competing interests involved with any approach. On the one hand, there is the goal of maintaining a progressive worker's compensation system. *Carter.* On the other, there is the goal of reducing fraudulent claims in order to financially preserve the system. *Townsend.* It is, however, the province of the legislature to make changes in the provisions of coverage under the Act. *Varos v. Union Oil Co. of California,* 101 N.M. 713, 688 P.2d 31 (Ct.App.1984).

Section 52–1–28 does not distinguish between a physical and mental injury, nor does any provision of the Act condition compensation on an injury resulting from unusual or extraordinary working conditions. *Webb; Lyon.* The application of the *School District* rule would mean that a mental injury, to be compensable, must result from an extraordinary working condition, whereas a physical injury, to be compensable, need only result from the usual conditions of employment. Application of the higher standard of proof in *Townsend* would also differentiate between physical and mental injury. To establish disability, a worker with a pre-existing physical condition that makes him more susceptible to physical injury is not subjected to a higher standard of proof than a worker not so disposed. *Salazar v. County of Bernalillo.* However, a worker predisposed to mental injury from day-to-day stress would have to establish, by clear and convincing evidence, the causal connection between the trauma generated by the employment and the resulting disability. The basis for such differentiation is not present in our Act. We must defer to the legislature. *Varos; see McGarrah v. State Accident Insurance Fund Corp.,* 296 Or. 145, 675 P.2d 159 (1983).

We conclude that a psychological injury resulting from a sudden or gradual emotional stimulus "arises out of" employment when it is causally related to the performance of job duties. This standard is in keeping with the letter, and purpose, of the Act. This standard also makes no distinction between those workers predisposed to mental injury and those not so disposed. Plaintiff, through the recited testimony, has met this standard.

■ Our conclusion presupposes the existence of an actual job condition which causes the stress (actual stress), rather than a perceived condition that does not exist (imagined stress). Actual stress is that stress traceable to real working conditions; imagined stress exists when a worker honestly perceives that some event, or events, occurred during the course of his employment to cause injury when, in fact, no such event or events occurred. *See McGarrah.* In this case, defendants contend that plaintiff testified about occurrences existing only in his mind. They base their contention on testimony that plaintiff's disorders could cause him to distort reality. They challenge the trial court's finding of actual stress.

■ Substantial evidence supports this finding. *Garcia v. Genuine Parts Co.,* 90 N.M. 124, 560 P.2d 545 (Ct.App.1977). First, there was no evidence that plaintiff had trouble coping with other situations. Logically, this supports an inference of actual stress at work. Second, there was a flare-up in plaintiff's symptoms each time he returned to work. Third, Jewett had a reputation as the type of foreman who would "ride on a person." Fourth, Dr. Fredman testified that even paranoid ideations have some basis in reality. Fifth, Dr. Sacks testified that there was no condition suffered by plaintiff that would cause him to misperceive reality. The trial court's finding of actual stress will not be overturned.

We do not, at this time, address the complex issue of whether the effect of the *perceived* work environment on the worker, i.e., imaginary stress, is sufficient to establish an injury "arising out of" the employment. Such a discussion is not necessary in the present case because there is evidence of the effect of the *actual* work environment. *See McGarrah* and *Williams v. Western Electric Co.,* 178 N.J. Super. 571, 429 A.2d 1063 (1981), for a discussion of actual versus imaginary stress.

Any plaintiff must still demonstrate that, as a medical probability, any disability is a natural and direct result of the accidental injury. Section 52–1–28. Expert medical testimony is required to establish this causal connection. *Id.* The testimony of Drs. Fredman and Sacks provided substantial evidence on causation for plaintiff in this case.

## II. POST-JUDGMENT RELIEF

At trial, plaintiff testified that he had been unsuccessful in finding new employment. After trial, defendants discovered that plaintiff had been working at the time of trial. Defendants moved for a new trial and deposed the bookkeeper of the business for which plaintiff worked. A hearing was held. Defendants argued that plaintiff had lied under oath. Plaintiff's attorney argued that the context of the testimony was simply that plaintiff had been unsuccessful in finding similar employment. The trial court ordered that plaintiff's doctors be re-deposed to determine if knowledge of plaintiff's employment would cause them to change their opinions.

The doctors' depositions were taken. Dr. Fredman testified that the opinions he expressed at trial had not changed because plaintiff still had symptoms, but they were less severe because the current job had less stress and less interpersonal contacts. Dr. Fredman thought that it was especially significant that plaintiff's stepson was the foreman and understood plaintiff's problems. Dr. Sacks stated that assuming plaintiff's new job involved simple tasks as a laborer, few interpersonal contacts, and supervision by a sympathetic stepson, he would not change the opinion expressed in the original deposition.

The trial court entered supplemental findings and conclusions, and an order denying post-judgment relief. The court found that the new employment did not affect the doctors' opinions. The court also found that the job involved the performance of simple tasks, subjected plaintiff to minimum stress and interpersonal contact, and provided supervision by his stepson, who understood his emotional problems. Finally, the court found in its supplemental

findings and conclusions that objective evidence of plaintiff's psychological disability overcame any taint which plaintiff's testimony might have cast upon his testimony in other areas.

The granting or denial of a new trial rests within the sound discretion of the trial court. *Martinez v. Schmick*, 90 N.M. 529, 565 P.2d 1046 (Ct.App.1977). The same is true for Rule 60(b) motions. *Click v. Litho Supply Co.*, 95 N.M. 419, 622 P.2d 1039 (1981). In this case, the trial court took new evidence, and the findings indicate that the trial judge carefully considered the impact of plaintiff's new employment. The trial court did not abuse its discretion in failing to grant post-judgment relief.

## III. ATTORNEY FEES

Defendants argue that the trial court's award of $15,000.00 in attorney fees was excessive. An award of fees must have evidentiary support. *See Woodson v. Phillips Petroleum Co.*, 102 N.M. 333, 695 P.2d 483 (1985); *Johnsen v. Fryar*, 96 N.M. 323, 630 P.2d 275 (Ct.App. 1980). The record discloses that both the statutory factors for attorney fees contained in Section 52-1-54, and the factors enumerated in *Fryar v. Johnsen*, 93 N.M. 485, 601 P.2d 718 (1979), were considered by the trial court. The determination of the present value of the award at approximately $63,000.00, the amount of time expended by plaintiff's attorneys, and the extent to which causation and the meaning of accidental injury were contested are critical factors which support the trial court's award. *Fryar.* We note, moreover, that an award is not to be set at a specific percentage of the recovery. *Woodson.* The percentage in this case, about 23%, is consistent with the principles articulated in *Woodson.* The award is affirmed.

## IV. INTEREST ON JUDGMENT

Defendants challenge the following part of the alias judgment:

Interest at the rate of 15% per annum on all sums due pursuant to this judgment, except for medical, doctor, hospital and drug bills, from and after the date of entry of this judgment, until paid.

Defendants argue that the award of interest is discretionary and that the trial court abused its discretion in awarding interest. It is true that an award of pre-judgment interest is discretionary. *Waksman v. City of Albuquerque*, 102 N.M. 41, 690 P.2d 1035 (1984); *Trujillo v. Beaty Electric Co.*, 91 N.M. 533, 577 P.2d 431 (Ct.App.1978). However, post-judgment interest is mandatory according to NMSA 1978, Section 56-8-4(A) (Cum.Supp.1985):

Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of fifteen percent per year, unless the judgment is rendered on a written instrument having a different rate of interest * * *.

There is nothing which indicates that Section 56-8-4(A) should not apply in workmen's compensation cases. This section was enacted in 1983 and there are no workmen's compensation cases construing the section. Logic dictates that interest should not accrue on installments until they become due. This is especially true when one considers that the employer, after six months, may attempt to reduce benefits because of decreasing disability.

The district court's judgment is proper because, in accordance with Section 56-8-4(A), it awards interest on sums due pursuant to the judgment, from and after the entry of the judgment. Thus, the judgment does not award interest on any amount until that amount becomes due. The trial court is affirmed.

The court determines that plaintiff's counsel is entitled to an award of attorney fees for services on appeal in the amount of $2,500.00. Section 52-1-54(D).

The judgment of the district court is affirmed.

IT IS SO ORDERED.

DONNELLY, C.J., and MINZNER, J., concur.