2006-NMCA-055

134 P.3d 131

Dominic ROMERO, Worker–Appellant,

v.

CITY OF SANTA FE, Self–Insured, Employer–Appellee.

No. 25,573.

Court of Appeals of New Mexico.

March 28, 2006.

Law Offices of Jeffrey C. Brown, Jeffrey C. Brown, Albuquerque, NM, for Appellant.

French & Associates, P.C., Katherine E. Tourek, Albuquerque, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} In this case, we examine the requirement in NMSA 1978, § 52–1–24(B) (1990), that a worker must suffer a "psychologically traumatic event" in order to receive workers' compensation benefits for a work-related mental illness that is unaccompanied by physical injury. Because the worker in this case did not suffer a psychologically traumatic event within the meaning of the statute, we affirm the order of the workers' compensation judge (WCJ) denying compensation.

## FACTS AND PROCEEDINGS BELOW

{2} Dominic Romero (Worker) worked as a swimming pool manager for the City of Santa Fe. As part of his duties, Worker was required to perform cleaning and maintenance tasks at one of the City's pools, which was an outdoor pool. Worker had com-

plained to his supervisors on several occasions about ongoing problems with pigeons in the pool area and on the roof of the building adjoining the pool. Worker testified that on two occasions in March 2003, he went up onto the roof to clean up pigeon detritus. Worker estimated that he cleaned up about 160 pounds of pigeon feces and carcasses. Worker testified that he would get headaches after dealing with the pigeon matter. Subsequently, the City hired an independent company to clean up the roof. The company removed approximately one and one-half tons of pigeon matter from the roof.

{3} On June 5, 2003, Worker became ill. He began to experience photophobia, nausea, disturbing dreams, and body tremors. Worker saw several doctors and underwent extensive testing, but none of the testing revealed any non-psychological condition that could be causing his symptoms. Worker also saw a psychiatrist, Dr. Davis, who stated that Worker met most of the criteria for post-traumatic stress disorder (PTSD). Davis was initially skeptical that Worker suffered from PTSD, because a diagnosis of PTSD generally requires that the patient's symptoms are precipitated by an event that is objectively life threatening. Davis initially felt that Worker's experiences cleaning up pigeon detritus did not qualify as an objectively life-threatening event that would cause PTSD. Contrary to Worker's claim that Davis diagnosed him with PTSD, Davis did not clearly state an opinion on whether Worker suffered from PTSD. Davis stated that if he had to provide an alternate diagnosis, he would say that Worker was suffering from "major depressive disorder, generalized anxiety disorder and panic disorder, and adjustment disorder with depression and behavioral features." Davis further opined that having to clean up large amounts of pigeon detritus was outside of the usual experiences of most pool workers and doing so would evoke symptoms of distress in other workers.

{4} Worker brought a claim for compensation under Section 52–1–24(B), which states in full:

"primary mental impairment" means a mental illness arising from an accidental injury arising out of and in the course of employment when the accidental injury involves no physical injury and consists of a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances, but is not an event in connection with disciplinary, corrective or job evaluation action or cessation of the worker's employment[.]

{5} After a hearing, the WCJ denied compensation. The WCJ found that Worker had been in an "accident" on June 5, 2003, the date on which Worker first began to suffer significant symptoms. The WCJ also made the following findings:

23. As a direct and proximate result of the accident of June 5, 2003, to a reasonable medical probability, Worker suffered a mental impairment. The nature of the injury fits neither primary, nor secondary mental impairment. There was no physical injury, and no psychologically traumatic event outside of the Worker's usual experience.

24. The events of June 5, 2003, would not have evoked distress in a worker in similar circumstances.

{6} The WCJ entered the following conclusions:

2. [Worker's] accident of June 5, 2003, arose out of employment with Employer.

3. The accident of June 5, 2003, was in the course of employment with Employer.

. . . .

6. Worker's injuries are purely psychological, but were *not* the result of a traumatic event so as to qualify as a primary mental impairment. *Jensen v. New Mexico State Police*, 109 N.M. 626[, 788 P.2d 382] (Ct.App.1990).

{7} Worker appeals from the order denying compensation. Worker advances three arguments on appeal: (1) the WCJ's finding that Worker did not suffer a psychologically traumatic event that was outside of his usual experiences and would evoke symptoms of distress in similarly situated workers is not

supported by substantial evidence; (2) the WCJ misinterpreted the law in determining that, in order for an injury to be compensable, the psychologically traumatic event must be catastrophic in nature; and (3) if the statute does require the traumatic event to be catastrophic in nature, it violates the equal protection clause of the New Mexico Constitution by discriminating against workers with mental disabilities. We reject all of Worker's arguments.

## DISCUSSION

### 1. The WCJ Did Not Err in Determining That Worker Did Not Suffer a Psychologically Traumatic Event Under Section 52–1–24(B)

{8} Worker contends that (1) the WCJ erred in requiring Worker to show a "catastrophic" event in order to satisfy the "psychologically traumatic event" requirement of Section 52–1–24(B) and (2) the WCJ's decision that Worker did not suffer any event that would meet the requirements of the statute was not supported by substantial evidence.

{9} Worker's real disagreement is with the WCJ's determination that Worker did not suffer a psychologically traumatic event within the meaning of the statute. This is a conclusion of law and not a finding of fact that we would review for substantial evidence. Indeed, the WCJ did not make any underlying factual findings that Worker disputes. Accordingly, we will address Worker's arguments in the following manner. We will first set forth the requirements of the statute as established in prior cases. In so doing, we will address Worker's contention that the statute does not require a "catastrophic" event. We will then address the WCJ's determination that Worker did not experience a psychologically traumatic event within the meaning of the statute. Because the WCJ did not make underlying findings of historical fact to support his ruling, we will examine the record to ascertain the historical facts on which the WCJ based his decision, in order to ensure that there was substantial evidence in the record that would support the WCJ's decision. *See State v. Lopez*, 2005–NMSC–018, ¶ 22, 138 N.M. 9, 116 P.3d 80 (noting that where trial court has not entered specific findings, "we must draw from the record to derive findings based on reasonable facts and inferences and determine whether those facts and inferences support the conclusion reached by the court" (internal quotation marks and citation omitted)). Finally, we will address whether those facts show that Worker did not suffer a psychologically traumatic event within the meaning of the statute. This step requires us to review the WCJ's application of the law to the facts, making sure that the WCJ applied the correct law. This is a task we perform de novo. *See Tom Growney Equip. Co. v. Jouett*, 2005–NMSC–015, ¶ 13, 137 N.M. 497, 113 P.3d 320 (reviewing WCJ's application of law to facts de novo).

{10} In order to demonstrate a psychologically traumatic event under Section 52–1–24(B), a worker must show three things: (1) that a specific and identifiable psychologically traumatic event has occurred, (2) that the event is "generally outside of a worker's usual experience," and (3) that the event "would evoke significant symptoms of distress in a worker in similar circumstances." *Jensen*, 109 N.M. at 628, 788 P.2d at 384 (internal quotation marks, citation, and emphasis omitted). The first element, a psychologically traumatic event, is a "threshold criterion." *Id.* If no psychologically traumatic event is shown, a court need not analyze the second and third elements. *Id.* at 629, 788 P.2d at 385. In this case, we conclude that Worker did not suffer a psychologically traumatic event within the meaning of the statute. Thus, we do not reach the other elements.

{11} *Jensen* was the first case to examine what constitutes a psychologically traumatic event. In *Jensen*, the worker was a police dispatcher. *Id.* at 627, 788 P.2d at 383. Due to other employees quitting, the worker's facility experienced understaffing. *Id.* The dispatchers were required to work eight-hour shifts alone and often could not take any breaks. *Id.* The worker filed a claim seeking compensation due to an alleged primary mental impairment, which he contended was brought on by the understaffing. *Id.* Although this Court noted that being a dispatcher was considered a stressful job even

under normal circumstances, *id.,* we affirmed the WCJ, holding that understaffing did not qualify as a psychologically traumatic event under Section 52–1–24(B). *Jensen,* 109 N.M. at 629, 788 P.2d at 385.

{12} We began our analysis by noting the important changes that had recently been made to New Mexico workers' compensation law involving mental disabilities. We first examined *Candelaria v. General Electric Co.,* 105 N.M. 167, 730 P.2d 470 (Ct.App.1986), *superceded by statute as stated in Breen v. Carlsbad Mun. Schs.,* 2005–NMSC–028, ¶ 33, 138 N.M. 331, 120 P.3d 413, in which we had held that a mental disability accruing gradually and resulting from stress caused by a worker's "day-to-day activities" was compensable under the Workers' Compensation Act. *Jensen,* 109 N.M. at 628, 788 P.2d at 384. We noted that in the legislative session immediately following the filing of *Candelaria,* our Legislature had amended the Act to include Section 52–1–24(B). *Jensen,* 109 N.M. at 628, 788 P.2d at 384. We implied that Section 52–1–24(B) was intended to supercede *Candelaria. Jensen,* 109 N.M. at 629, 788 P.2d at 385.

{13} We then proceeded to examine what type of event would satisfy Section 52–1–24(B). We noted that the language of the statute was substantially similar to the language used in the discussion of PTSD found in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM). *Jensen,* 109 N.M. at 629, 788 P.2d at 385. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000). We noted that events described by the DSM as producing PTSD included rape, assault, military combat, floods, earthquakes, car accidents, airplane crashes, large fires, bombing, torture, and death camps. *Jensen,* 109 N.M. at 629, 788 P.2d at 385. We then held as follows:

> Section 52–1–24(B) reflects a legislative intent to limit primary impairment to sudden, emotion-provoking events of a catastrophic nature as described [in the DSM description of PTSD] as opposed to gradual, progressive stress-producing causes such as occurred in *Candelaria* (harassment by supervisor over period of time).

*Id.* Applying this standard, we concluded that "[t]he event that precipitated worker's symptoms, understaffing, does not meet the definition of a 'psychologically traumatic event' under the facts of this appeal." *Id.*

{14} The *Jensen* rule has become well established, and numerous subsequent cases have quoted or referred to the above-mentioned holding, either in dicta, or in support of their substantive holdings. *See Chavez v. Mountain States Constructors,* 122 N.M. 579, 586, 929 P.2d 971, 978 (1996) (citing *Jensen* and reciting the list of events from the DSM in examining whether a rollover accident involving a dump truck satisfied the "would evoke significant symptoms of distress in a worker in similar circumstances" element of Section 52–1–24(B)); *Breen,* 2005–NMSC–028, ¶ 40, 138 N.M. 331, 120 P.3d 413 (citing *Jensen* in discussing the legislative goals behind the proof requirements of Section 52–1–24(B)); *Coates v. Wal–Mart Stores, Inc.,* 1999–NMSC–013, ¶¶ 32–34, 127 N.M. 47, 976 P.2d 999 (quoting above-mentioned portion of *Jensen* in holding that tort claims were not barred by exclusivity provisions of the Workers' Compensation Act because mental distress caused by ongoing sexual harassment was not compensable under the Act); *Collado v. City of Albuquerque,* 120 N.M. 608, 613–14, 904 P.2d 57, 62–63 (Ct.App.1995) (repeating the list of events from the DSM and citing *Jensen* for the proposition that Section 52–1–24(B) uses language similar to that found in the DSM); *Douglass v. State Regulation & Licensing Dep't,* 112 N.M. 183, 186, 812 P.2d 1331, 1334 (Ct.App.1991) (citing relevant portion of *Jensen* for the proposition that the Legislature intended to "make gradual, stress-caused mental injuries non-compensable under the New Act" (emphasis omitted)); *Holford v. Regents of Univ. of Cal.,* 110 N.M. 366, 368, 796 P.2d 259, 261 (Ct.App.1990) (quoting *Jensen* in support of holding that work environment allegedly leading to "derangement which resulted in . . . suicide" was not a sufficient event under Section 52–1–24(B)).

{15} It is clear from *Jensen* and the subsequent cases that in order to prevail on a Section 52–1–24(B) claim, a worker must allege a specific, identifiable, and significant

traumatic event. Work-related mental injuries are not compensable under the Act where (1) they are caused by a specific and identifiable event that is arguably traumatic but is not significant enough to qualify as a psychologically traumatic event under the statute and our cases interpreting it or (2) they accrue gradually over time as a result of ongoing, distressing work-related experiences. *See Breen*, 2005–NMSC–028, ¶ 40, 138 N.M. 331, 120 P.3d 413 (noting that the definition of primary mental impairment is "purposefully narrow in scope so that it covers only mental illnesses that arise from a specific and definite occurrence, and not mental illnesses that develop gradually over time").

{16} Worker appears to argue that the WCJ's decision was based on category (1) above, i.e., Worker believes that the WCJ determined that Worker's experiences may have been "traumatic events" in the colloquial sense, but were not traumatic enough, or "catastrophic" enough, to qualify as predicate events under Section 52–1–24(B). Worker further argues that the statute itself does not require a "catastrophic" event and that *Jensen* wrongly imposed that requirement. Worker points out that the other proof requirements in the statute already guard against recovery for mental illnesses caused by mundane events.

{17} Worker may be correct that *Jensen* may have overstated how severe an event must be to satisfy Section 52–1–24(B) and may have overemphasized the importance of the list of traumatic events from the DSM. Specifically, we note that *Jensen* was concerned with gradually accruing mental problems caused by ongoing stress. *Jensen*, 109 N.M. at 629, 788 P.2d at 385. Thus, the *Jensen* Court was not required to decide "how traumatic" a traumatic event must be in order to satisfy the statute. While the Legislature did use language "markedly similar to the medical definition of PTSD," *Collado*, 120 N.M. at 613–14, 904 P.2d at 62–63, we doubt that the Legislature intended to limit recovery to those workers suffering from mental illnesses caused by an event that is scientifically proven to cause PTSD. Certainly our courts have not intended the DSM list

to be exclusive. *See Chavez*, 122 N.M. at 586, 929 P.2d at 978 (noting that even if the DSM list did not include severe car accidents, "it is self-evident that for almost any person ... rolling a loaded dump truck would be traumatic").

{18} However, our cases clearly require the traumatic event to be "catastrophic" in nature, and Worker has not persuaded us that those cases were wrongly decided. In enacting Section 52–1–24(B), the Legislature clearly intended to supersede this Court's holding in *Candelaria* and allow for compensation only in cases where a significant traumatic event has occurred. The use of the word "catastrophic" in past cases is simply a way of defining the category of cases in which the Legislature intended to allow compensation. It is not a separate requirement that our courts have imposed.

{19} In any event, we need not further address our concerns regarding the breadth of the holding in *Jensen*, because we are confident that the WCJ's decision was based on category (2) above. In other words, we believe the WCJ found that Worker's illness was caused by his ongoing, distressing experiences of having to clean up pigeon matter. We do not believe the WCJ found that Worker suffered a specific and identifiable, but not sufficiently catastrophic, event. We base this interpretation of the order on two factors. First, the WCJ found that Worker's illness was *"not* the result of a traumatic event." We do not think the WCJ would have made this statement had he in fact meant that Worker's illness was caused by a traumatic event, but that the event was not traumatic enough, or was not "catastrophic" enough, to satisfy the statute. Second, we note the following finding, which was requested by Worker and rejected by the WCJ:

26. If not for the dicta in *Jensen* delineating what that Court considered to be a psychologically traumatic event, this [c]ourt would have found that Worker's accidental injury and resulting psychological illness was compensable.

By "the dicta in *Jensen*," Worker was clearly referring to the section that quotes the DSM, and not to *Jensen's* central holding that inju-

ries caused by "gradual, progressive stress-producing causes" are not compensable. *See Jensen,* 109 N.M. at 629, 788 P.2d at 385.

{20} When a party bearing the burden of proof requests a finding on a particular issue and that finding is rejected, we view the rejection as a rejection of the position advocated for in the requested finding. *Gonzales v. Lopez,* 2002–NMCA–086, ¶ 27, 132 N.M. 558, 52 P.3d 418. Thus, it is clear to us that the WCJ was rejecting Worker's argument that Worker should be found ineligible for compensation only because the events he experienced were not traumatic enough. Rather, we think the WCJ found this case to be factually analogous to *Jensen,* because Worker's illness was caused by ongoing work-related stress, rather than by one or more specific and identifiable traumatic events. We agree with the WCJ.

{21} As we have stated, the WCJ did not make factual findings regarding the relevant historical facts in this case. Rather, he merely entered a conclusion of law stating that Worker did not suffer a traumatic event under *Jensen.* Thus, we must examine the record to determine whether the evidence presented below supports the conclusion that Worker's experiences were analogous to those in *Jensen. See Lopez,* 2005–NMSC–018, ¶ 22, 138 N.M. 9, 116 P.3d 80 (drawing from the record to establish historical facts where the trial court did not enter specific findings). We believe that Worker's own testimony and his requested findings of fact were sufficient to establish that his illness was caused by the type of ongoing, stress-producing causes referred to in *Jensen.* We proceed to briefly outline his testimony and requested findings.

{22} In March of 2003, Worker was assigned to prepare the outdoor pool for opening in the summertime. Worker testified that he spent a significant amount of time during the spring of 2003 cleaning the matting in the building adjacent to the pool because the roof had leaked and the matting was soiled with pigeon feces. Worker also testified that there was pigeon feces in the pool and in the deck area. He stated that he would often have to clean out the pool strainers because they would become clogged with

feces, carcasses, and feathers. Worker estimated that during April and May, he spent one to two hours a day cleaning up pigeon feces on the matting and in the area surrounding the pool. Worker testified that he would experience mild headaches after dealing with the pigeon matter.

{23} Worker testified that he went up on the roof and removed pigeon matter on two occasions. He stated that he used 45–gallon garbage bags, which he would fill approximately half to three-quarters of the way full. Worker's exhibits establish that he removed two bags of pigeon matter on each of the two occasions when he worked on the roof. Worker stated that on these two occasions, he "didn't even dent" the amount of pigeon detritus on the roof. Worker stated that the odor on the roof was "horrible" and that it made him nauseous and gave him headaches.

{24} Worker requested the following findings of fact:

1. Worker testified that from the time that he started working at the [outdoor pool] there was a problem with pigeons and pigeon droppings.

. . . .

4. Worker testified credibly that before June 5, 2003, he and other people suffered from headaches and nausea when they worked at the pool. . . .

. . . .

6. Worker's Trial Exhibits . . . give ample evidence to support Worker's testimony that the [pool] area, especially the roof, was inundated with pigeon fecal matter and produced foul odors.

7. Worker testified that he was asked to clean up the pigeon feces and carcasses from the [pool] roof. . . .

. . . .

19. Worker has a psychological condition caused by his exposure to the pigeon feces and detriment [sic] at his place of employment.

{25} Worker's testimony and his requested findings do not indicate that Worker suffered a psychologically traumatic event. In fact, we cannot say that Worker has alleged any "event" at all. We note that while Worker's

appellate brief puts some emphasis on the occasions when Worker cleaned up pigeon matter on the roof, his requested findings of fact do not make significant mention of those occasions. The requested findings state only that he "was asked to clean up the pigeon feces and carcasses from the [pool] roof." The requested findings do not mention any details about those occasions, such as how many times he worked on the roof, the relevant dates, or how much pigeon matter he removed. On balance, Worker's statements indicate an ongoing problem with pigeon detritus, not one or more specific and identifiable distressing events. *Jensen* speaks to precisely such an ongoing pattern of occurrences that are relatively insignificant when viewed in isolation but combine to distress a worker. Thus, we hold that the WCJ did not err in ruling that Worker did not suffer a psychologically traumatic event under Section 52–1–24(B).

■ {26} Before turning to Worker's constitutional argument, we briefly address two additional arguments he makes with regard to the WCJ's finding that he did not suffer a psychologically traumatic event. First, Worker appears to argue as follows: Worker's expert witness, a psychiatrist, testified that Worker suffered a "traumatic event"; this testimony was uncontroverted; thus the WCJ was required to accept the testimony. Worker appears to be referring to the "uncontroverted medical evidence rule," which dictates that where expert medical testimony regarding the "causal connection between disability and accident" in a workers' compensation case is uncontroverted, that testimony is binding on the trier of fact. *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 70, 716 P.2d 645, 648 (Ct.App.1986), *limited on other grounds by Graham v. Presbyterian Hosp. Ctr.*, 104 N.M. 490, 492, 723 P.2d 259, 261 (Ct.App.1986). Worker's argument is unavailing. The uncontroverted medical evidence rule applies to issues of causation, and the question of whether Worker experienced a traumatic event is not a causation issue. Moreover, the term "traumatic event" is a term of art with a specific meaning under the Act. Thus, whether Worker experienced a "traumatic event" is a question of law that is not subject to conclusive proof by expert

testimony. *Cf. State v. Elliott*, 2001–NMCA–108, ¶ 22, 131 N.M. 390, 37 P.3d 107 ("[O]pinion testimony that seeks to state a legal conclusion is inadmissible."). We reject Worker's argument with regard to the expert testimony.

■ {27} Second, Worker argues that he should prevail based on one of this Court's unpublished memorandum opinions, *Carrasco v. Carlsbad Mun. Schs.*, Nos. 20,833/20,832 (May 29, 2001). As Worker acknowledges, memorandum opinions have no precedential value and should not be cited. Rule 12–405(C) NMRA ("An order, decision or memorandum opinion ... shall not be published nor shall it be cited as precedent in any court."). As we have made clear in the past,

> Unpublished decisions are not meant to be used as precedent; they are written solely for the benefit of the parties. Because the parties know the facts of the case, a memorandum opinion may not describe fully the critical facts upon which the case was decided. When the facts of a case are not fully known, it is not possible to know whether it can be accurately distinguished from similar cases.

*Winrock Inn Co. v. Prudential Ins. Co.*, 122 N.M. 562, 569, 928 P.2d 947, 954 (Ct.App. 1996) (internal citations omitted). We agree that on the surface, the facts of *Carrasco* bear some similarities to the facts of this case. We also note some distinguishing factors between the two cases. However, in light of the above policies, we decline to address the facts of *Carrasco*.

**2. Section 52–1–24(B) Does Not Violate Equal Protection**

■ {28} Finally, Worker argues that if Section 52–1–24(B) is interpreted to require a showing of a "catastrophic event," that requirement violates equal protection under the New Mexico Constitution. Worker argues that requiring a showing of a catastrophic event discriminates against workers with mental disabilities because workers with physical disabilities are not required to make such a showing. Worker also argues that, if a catastrophic event is required, the statute violates equal protection by creating two

classes of workers who have mental disabilities—those who have suffered a catastrophic event and those who have not. We review challenges based on equal protection de novo. *See Pinnell v. Bd. of County Comm'rs*, 1999–NMCA–074, ¶ 17, 127 N.M. 452, 982 P.2d 503 (reviewing equal protection challenge de novo).

{29} As we have already held, the requirement that a worker must demonstrate a catastrophic event in order to prevail on a Section 52–1–24(B) claim is not a new or additional requirement that our courts have imposed. Rather, it is an attempt by our courts to define and clarify what the Legislature has already required. As such, the requirement does not merit a different analysis from the analysis that would be performed with regard to the other proof requirements in the statute. Those proof requirements have already been challenged and held to be constitutional, a decision that was reaffirmed by our Supreme Court just last year.

{30} In *Breen*, 2005–NMSC–028, 138 N.M. 331, 120 P.3d 413, our Supreme Court conducted an equal protection analysis of NMSA 1978, § 52–1–41(B) (1999), of the Worker's Compensation Act, which limited compensation for workers with mental disabilities to 100 weeks. *Breen*, 2005–NMSC–028, ¶ 1, 138 N.M. 331, 120 P.3d 413. Because the statute made a legislative classification on the basis of mental disability, the Court applied intermediate scrutiny. *Id.* ¶ 28. The Court held that the 100–week limitation violated the equal protection clause of the New Mexico Constitution because it was not "substantially related to furthering the purposes and goals of the Act." *Id.* ¶ 50.

{31} As part of its analysis, the Court examined Section 52–1–24(B). *Breen*, 2005–NMSC–028, ¶ 40, 138 N.M. 331, 120 P.3d 413. The Court determined that the proof requirements of Section 52–1–24(B) represented "a valid way to prevent fraudulent claims from being compensated in the first place." *Breen*, 2005–NMSC–028, ¶ 40, 138 N.M. 331, 120 P.3d 413. The Court then cited *Jensen*, noting that the definition of primary mental impairment was "purposefully narrow in scope." *Breen*, 2005–NMSC–028, ¶ 40, 138

N.M. 331, 120 P.3d 413. The Court stated that the elements of the statute constituted "permissible proof requirement[s]." *Id.* The Court followed this point with a cite to *Holford*, 110 N.M. 366, 796 P.2d 259, in which this Court had held that the proof requirements of Section 52–1–24(B) did not violate equal protection. *Breen*, 2005–NMSC–028, ¶ 40, 138 N.M. 331, 120 P.3d 413.

■ {32} We acknowledge that *Holford* applied rational basis review, rather than intermediate scrutiny. *See Holford*, 110 N.M. at 368, 796 P.2d at 261 ("[W]e find that the limitations on proof of primary mental impairment in Section 52–1–24(B) are not arbitrary and unreasonable, but are rationally related to a legitimate legislative purpose."). We agree with Worker that Section 52–1–24(B) does make a legislative classification based on mental disability—it imposes a proof requirement on workers with mental disabilities that is not imposed on workers with physical disabilities. *See* NMSA 1978, § 52–1–28 (1987) (setting forth the proof requirements for all workers' compensation claims). We also acknowledge that, after *Breen*, legislative classifications based on mental disability should receive intermediate scrutiny. 2005–NMSC–028, ¶ 28, 138 N.M. 331, 120 P.3d 413 ("Based on our development of New Mexico's Equal Protection Clause, it is appropriate to apply intermediate scrutiny to classifications based on mental disability because such persons are a sensitive class."). Finally, we acknowledge that the *Breen* Court did not directly examine the constitutionality of Section 52–1–24(B). *See Breen*, 2005–NMSC–028, ¶¶ 40–44, 138 N.M. 331, 120 P.3d 413 (examining the proof requirements of Section 52–1–24(B) in order to demonstrate that there are less restrictive means of preventing fraudulent claims than placing a cap of 100 weeks on all claims of mental disability).

{33} Despite all these factors, however, we are constrained to hold that the proof requirements of Section 52–1–24(B), including the clarification that traumatic events must be catastrophic in nature, do not violate equal protection. It would simply be inappropriate for this Court to strike the statute down, or even to examine its constitutionality, when our Supreme Court clearly stated,

just a few months ago, that the proof requirements were "valid" and "permissible." *See State ex rel. Martinez v. City of Las Vegas,* 2004–NMSC–009, ¶¶ 18–22, 135 N.M. 375, 89 P.3d 47 (disapproving of this Court's decision that we could ignore Supreme Court precedent if we concluded that the Supreme Court would reverse itself if given the opportunity, and holding that this Court is bound by Supreme Court precedent, even if a case is old, has not been reaffirmed, and has been subject to scholarly criticism). Under these circumstances, we reject both of Worker's equal protection arguments, and we hold that Section 52–1–24(B) does not violate the equal protection clause of the New Mexico Constitution.

## CONCLUSION

{34} The judgment of the WCJ is affirmed.

{35} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, IRA ROBINSON, Judge.