788 P.2d 382

Neils Louis **JENSEN,**
Claimant–Appellant,

v.

**NEW MEXICO STATE POLICE,**
Respondent–Appellee.

No. 11454.

Court of Appeals of New Mexico.

Jan. 23, 1990.

Certiorari Denied March 5, 1990.

Martin J. Chavez, Chavez Law Offices, Albuquerque, for claimant-appellant.

John J. Carmody, Jr., Carmody & Associates, P.A., Albuquerque, for respondent-appellee.

## OPINION

BIVINS, Chief Judge.

Worker appeals from a judgment denying him benefits under the Workers' Compensation Act. NMSA 1978, §§ 52-1-1 to -70 (Repl.Pamp.1987). This appeal raises the question of whether worker introduced sufficient proof to establish a primary mental impairment under Section 52-1-24(B). We hold he did not, and therefore affirm the judgment below.

Worker began his employment with the New Mexico State Police in 1969 as a state policeman. He performed routine patrol work until 1975, when he transferred to the narcotics division. He worked in that capacity until 1982, when he suffered a serious and disabling vehicular accident unrelated to his work. As worker was unable to return to work as a police officer, the state police assigned him as a communications equipment officer (radio dispatcher). After working several months in this capacity at the Socorro office, worker was transferred to the District 5 office in Albuquerque.

From eight to ten dispatchers worked the Albuquerque office. They operated in three shifts, the daytime shift from 8:00 a.m. to 4:00 p.m.; the evening shift from 4:00 p.m. to midnight; and the graveyard shift from midnight to 8:00 a.m. the following day. When worker commenced his duties at the Albuquerque office, two dispatchers usually handled the evening shift. Only one was needed for the graveyard shift. A dispatcher's duties included receiving calls from officers in the field, dispatching those calls, taking care of visitors, and similar duties. The job of a dispatcher is considered stressful under normal conditions, and even more stressful during the winter because of inclement weather conditions.

Conditions became more difficult in 1987 after two dispatchers left and were not replaced. Because of understaffing, dispatchers could not double up on any of the shifts. Working solo made it difficult, in some cases impossible, to take breaks.

Worker was admittedly slow, but experienced no difficulty in performing his duties until he began feeling stress in June of 1987. Worker's condition progressively worsened. By February 1988, worker left this employment and did not return. Although worker initially failed to return because of strep throat, he eventually sought early retirement for mental health reasons. On February 18, 1988, Dr. J.E. Hall, worker's family physician, wrote the Public Employees Retirement Board, suggesting medical retirement on account of depression.

The other dispatchers in the Albuquerque office worked under the same stressful conditions. One dispatcher said she left because of sexual harassment by a supervisor, low pay, and stress. Another left because of alcoholism unrelated to the job; she said that the job was stressful at times, particularly during bad weather in the winter months. Another worker left for a better-paying job, and one other retired. The duties of all dispatchers were essentially the same.

Worker filed his claim seeking total disability and other benefits based on an alleged primary mental impairment brought on by the stress of understaffing in the Albuquerque office. The workers' compensation judge found:

4. The nature of Claimant's job duties were [sic] stressful and the level of stress increased as a function of understaffing.

5. The stress that understaffing caused was not outside the worker's usual experience nor would it involve significant symptoms of distress in a worker in similar circumstances.

Based on those findings, the hearing officer concluded that worker did not suffer a compensable impairment and was not entitled to compensation. This appeal followed.

*Discussion*

Section 52-1-24(B) defines "primary mental impairment" as

a mental illness arising from an accidental injury arising out of and in the course

of employment when the accidental injury involves no physical injury and consists of *a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances,* but is not an event in connection with disciplinary, corrective or job evaluation action or cessation of the worker's employment. [Emphasis added.]

Because Section 52–1–24(B) substantially changes the law, we first examine the 1987 amendment. In interpreting the Workers' Compensation Act provisions after the 1987 amendments, we must bear in mind that "[i]t is the specific intent of the legislature that benefit claims cases be decided on their merits and that the common law rule of 'liberal construction' based on the supposed 'remedial' basis of workers' benefits legislation shall not apply in these cases." § 52–5–1. *See also Garcia v. Mt. Taylor Millwork, Inc.* (Ct.App.1989) (No. 10,996) (holding that Section 52–5–1 calls for a balanced and even-handed construction of the Act), *cert. granted* January 4, 1990.

In 1B A. Larson, *The Law of Workmen's Compensation* Section 42.20 (1987), Professor Larson describes three types of psychic injury: (1) a mental stimulus causing a physical injury; (2) a physical trauma causing a nervous injury; and (3) a mental stimulus causing a nervous injury. *See Consolidated Freightways v. Drake,* 678 P.2d 874 (Wyo.1984). Section 52–1–24(B) concerns the third category. We begin our discussion by examining case law as it existed before enactment of Section 52–1–24(B). Understanding how the law was interpreted before the 1987 amendment helps us understand the significance of the changes and therefore to give effect to legislative intent. *See State v. Chavez,* 77 N.M. 79, 419 P.2d 456 (1966) (the fundamental rule in construing statutes is to ascertain and give effect to legislative intent).

Interpreting the original Act, NMSA 1978, §§ 52–1–1 to –69 (Orig.Pamp.), and particularly Section 52–1–28 thereof, this court in *Candelaria v. General Electric*

*Co.,* 105 N.M. 167, 730 P.2d 470 (Ct.App. 1986) held a psychological injury resulting from either a sudden or gradual emotional stimulus arises out of employment when it is causally related to performance of job duties. In so holding, we rejected the Wisconsin approach that mental injury must have resulted from a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience. *See School Dist. # 1 v. Department of Indus., Labor & Human Relations,* 62 Wis.2d 370, 215 N.W.2d 373 (1974). Instead, we applied the same "arising" standard as for other accidental injuries; we did not require stress beyond that encountered in the day-to-day activities of the worker. *Candelaria v. General Elec. Co.*

Noting the lack of differentiation under the original Act between proof required to establish mental injuries as opposed to physical injuries, the *Candelaria* court said it was within the province of the legislature to make changes in coverage if it so desired. In response to *Candelaria,* the legislature, at the session following the filing of the decision in that case, enacted Section 52–1–24. Comparing subsection B of that section with *Candelaria,* it is clear the legislature did indeed make a distinction between physical injuries and mental injuries and adopted specific requirements for proof of the latter. The question we must answer is what proof must be made in order to recover for a primary mental impairment. We now examine Section 52–1–24(B).

■ " '[P]rimary mental impairment' means a mental illness arising from an accidental injury * * * [that] consists of a *psychologically traumatic event* that is [1] generally outside of a worker's usual experience and [2] would evoke significant symptoms of distress in a worker in similar circumstances * * *." § 52–1–24(B) (emphasis added). In order for there to be a primary mental impairment, first there must be a "psychologically traumatic event." That is the threshold criterion.

Additionally, the psychologically traumatic event must be one that is generally

outside the worker's usual experience and one that would evoke significant symptoms of distress in a worker in similar circumstances. We read these two criteria as further qualifying what is required in order for there to be a psychologically traumatic event. We interpret the first qualifying phrase, "outside of a worker's usual experience," as referring to the employment. What might constitute a psychologically traumatic event in one employment may not in another. We read the second qualifying phrase, "would evoke significant symptoms of distress in a worker in similar circumstances," as establishing an objective standard.

■ We limit our inquiry in this case to the term "psychologically traumatic event" because, if the stress resulting from understaffing in this case does not qualify as such an event, worker failed to meet his burden of proof. It matters not whether the event giving rise to worker's condition was outside his usual experience, or was one that would evoke significant symptoms of distress in a worker in similar circumstances, if that event was not psychologically traumatic. *Webster's Third New International Dictionary* 2432 (1966) defines "trauma," as relates to a mental condition, as "a psychological or emotional stress or blow that may produce disordered feelings or behavior." *The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders* Section 309.-81 (3rd ed. 1980) provides examples in its discussion of post-traumatic stress disorder. The manual explains:

The essential feature [of post-traumatic stress disorder] is the development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience.

\* \* \* \* \* \*

The [psychologically traumatic event] producing this syndrome would evoke significant symptoms of distress in most people, and is generally outside the range of such common experiences as simple bereavement, chronic illness, business losses, or marital conflict. The

trauma may be experienced alone (rape or assault) or in the company of groups of people (military combat). Stressors producing this disorder include natural disasters (floods, earthquakes), accidental man-made disasters (car accidents with serious physical injury, airplane crashes, large fires), or deliberate man-made disasters (bombing, torture, death camps). Some stressors frequently produce the disorder (e.g., torture) and others produce it only occasionally (e.g., car accidents).

*Id.* at 236. We note a marked similarity in the terminology found in that manual and in Section 52–1–24(B).

Dr. Jaramillo, a psychiatrist who treated worker, stated that the stressors in worker's job created or precipitated his symptomatology. However, he conceded that this stress "may not exactly fit the criterion" of post-traumatic stress disorder. He said worker's symptoms "fit more in the depressive criteria." According to Dr. Jaramillo, post-traumatic stress disorder requires "a catastrophic event." Dr. Jaramillo said that worker's motorcycle accident might qualify as a catastrophic event, but he did not say that worker's job stress so qualified.

■ Section 52–1–24(B) reflects a legislative intent to limit primary impairment to sudden, emotion-provoking events of a catastrophic nature as described above as opposed to gradual, progressive stress-producing causes such as occurred in *Candelaria* (harassment by supervisor over period of time).

■ The event that precipitated worker's symptoms, understaffing, does not meet the definition of a "psychologically traumatic event" under the facts of this appeal. One would expect most businesses to encounter layoffs, changes in personnel, and other setbacks which from time to time will cause stress to workers. Had the legislature intended this type of event to qualify as a primary mental impairment, we believe it would have chosen different language.

Worker relies on *Swiss Colony, Inc. v. Department of Industry, Labor & Human Relations*, 72 Wis.2d 46, 240 N.W.2d 128 (1976), which held that evidence sustained a finding that the worker was exposed to work stresses and strains that were out of the ordinary day-to-day stresses and strains all employees must experience. *Swiss Colony* is distinguishable as to both the law and the facts.

As to the law, Wisconsin, unlike New Mexico, does not limit liability for mental injuries solely to those which are traumatically caused. *Compare* § 52–1–24(B) *with School Dist. # 1 v. Department of Indus., Labor & Human Relations.* Further, Wisconsin apparently does not require the objective standard that the event is one which would evoke significant symptoms of distress in a worker in similar circumstances.

Even if we were to disregard the additional requirements under the New Mexico statute for establishing a primary mental impairment, the facts in *Swiss Colony,* as concerns the "outside of a worker's usual experience" criterion, do not require a different result than was found by the hearing officer in this case. In *Swiss Colony,* the worker was subjected to mounting pressures due to the growth of the employer's business; she was subjected to harassment by a supervisor; and she was made to work long hours with no vacations. In the case before us, the record shows that worker, during the months of October, November, and December 1987 and January 1988, worked only eleven day shifts and five evening shifts alone. Worker's duty schedule was not disproportionate to the solo shifts worked by other dispatchers.

"One who seeks relief under a statute has the burden of, proving that he comes within its terms." *Baca v. Bueno Foods,* 108 N.M. 98, 102, 766 P.2d 1332, 1336 (Ct.App.1988). *See also Luchetti v. Bandler,* 108 N.M. 682, 777 P.2d 1326 (Ct. App.1989). Because worker sought benefits under the statutory provision for primary mental impairment, he had the burden of satisfying the requirements of the statute. Worker did not meet his burden. In reaching this result, we are mindful that the hearing officer did not make an express finding of no psychologically traumatic event, although he did make findings with respect to the two qualifying · terms. Worker requested a finding that the reduction in work force constituted a significant traumatic event, and that finding was not given. Where a party has the burden of proof on an issue and requests findings on that issue, which are refused, the legal effect of the refusal is a finding against that party. *H.T. Coker Constr. Co v. Whitfield Transp., Inc.,* 85 N.M. 802, 518 P.2d 782 (Ct.App.1974).

*Conclusion*

We affirm the findings and decision of the workers' compensation judge.

IT IS SO ORDERED.

ALARID. and APODACA, JJ., concur.