929 P.2d 971

Richard CHAVEZ, Claimant–Petitioner,

v.

**MOUNTAIN STATES CONSTRUCTORS,** employer, and Mountain States Mutual Casualty Company, insurer, Employer–Insurer–Respondents.

No. 22865.

Supreme Court of New Mexico.

Dec. 2, 1996.

Elizabeth Gabriel, Albuquerque, for Claimant–Petitioner.

Robert C. Collins and Donald C. Clifford, Albuquerque, for Employer–Insurer–Respondents.

## OPINION

FRANCHINI, Justice.

[1] As a consequence of a work-related truck accident, Richard Chavez incurred mental injuries that rendered him totally disabled. He was denied any benefits for his mental injuries because the Workers' Compensation Judge (WCJ) believed that recovery was barred by NMSA 1978, § 52–1–24 (Repl.Pamp.1991),[1] the portion of the Workers' Compensation Act that governs mental impairments. The WCJ and, on Chavez's appeal, the majority opinion of the Court of Appeals, concluded that Section 52–1–24

---

1. We cite to the current version of the Workers' Compensation Act, though the holding in this case also applies to the version in effect at the time the cause of action arose. *See* NMSA 1978, § 52–1–24(B) (Repl.Pamp.1987).

barred recovery because Chavez suffered both physical and mental injuries, Chavez did not prove his mental injuries resulted from his physical injuries, and the Legislature intended to preclude recovery on such facts.

[2] We conclude that under Section 52–1–24(B) of the Workers' Compensation Act, Chavez's truck accident qualifies as a "traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances." We further hold that, even though Chavez suffered physical as well as mental injuries, he is not barred from receiving benefits by the stipulation in Section 52–1–24(B) that the mental injury involve "no physical injury." We reverse the Court of Appeals and hold that Chavez may receive workers' compensation benefits for his mental injuries.

## I. FACTS

[3] Chavez was employed as a truck driver by Mountain States Constructors, Inc. On April 13, 1989, he was driving a loaded dump truck on a downgrade when the brakes apparently failed to work properly. As he attempted to negotiate the speeding truck around a curve, the vehicle rolled and landed on its side.

[4] Chavez incurred several physical injuries from the accident. He received twenty-eight stitches in the emergency room for two severe lacerations to his head. Also, the muscles and tendons surrounding his right shoulder joint—a physiological structure known as the rotator cuff—were torn. *See* 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* at R–192 (1996) (defining rotator cuff).

[5] After reparative surgery and physical therapy, Chavez was found, under American Medical Association guidelines, to have a permanent thirty-percent impairment of the use of his right shoulder. Because of his rotator-cuff injury, he was declared eligible for forty-eight percent of what he would receive if he were totally disabled, as calculated according to the formulae of the Workers' Compensation Act. *See* NMSA 1978, §§ 52–1–26(C), –41, –42 (Repl.Pamp.1991) (formulae). However, Chavez also displayed symptoms of mental impairment that were not present

before the accident. Although these mental injuries rendered him totally disabled, they were not taken into account in computing his award for benefits.

[6] On August 7, 1991, Chavez filed a workers' compensation claim for total disability benefits and medical expenses. He sought to be compensated for the physical injuries that rendered him partially disabled and the mental injuries that rendered him totally disabled. Mountain States contested his claim of total disability. After a mediation conference on September 12, 1991, the Workers' Compensation Mediator found that Chavez's injuries were "solely of a physical nature" and that his "neuropsychological problems have not been established, by anything resembling medical probability, to be causally connected to the accident of April 13, 1989." *Chavez v. Mountain States Constructors,* N.M. Workers' Compensation Admin., WCA No. 89–03931, ¶ 4(b) (Sept. 18, 1991) (Schoenhaus, Med.) (Mediator's recommended resolution) [*Chavez I* ].

[7] Chavez rejected this recommendation. Thereafter, he brought his case before a WCJ who conducted a series of formal hearings over the course of a year from August 10, 1992 to August 31, 1993. Several experts in psychology and psychiatry provided evidence regarding Chavez's mental impairment. Based upon the evidence presented by these experts, the WCJ concluded that Chavez suffered from Ganser's Syndrome. *See Chavez v. Mountain States Constr.,* N.M. Workers' Compensation Admin., WCA No. 89–03931, at 1 (Dec. 30, 1993) (Griego, WCJ) (memorandum opinion) [hereinafter *Chavez II* ].

[8] Ganser's Syndrome is "[a] condition marked by absurd acts on the part of the patient and by seemingly relevant but inaccurate answers to simple questions." 2 Schmidt, *supra,* at G–17. For example, when asked the colors of the United States flag Chavez responded white, blue, and pink. Letter from John M. Rhodes, Ph.D., Neuropsychology Assocs., to Tom Howell, Mountain States Casualty (March 24, 1990). When asked the number of days in a week he said there were six. Letter from Dr. Gerald S.

Fredman, psychiatrist, to Thomas E. Howell, Mountain States Mutual (July 15, 1991). Neurologic examinations established that there was no physical injury to Chavez's brain that would account for his mental impairment. The WCJ concluded that the Ganser's Syndrome was causally related to the dump truck accident and that Chavez was rendered unable to engage in any type of work without constant supervision.

[9] Despite the debilitating nature of Chavez's mental impairment, the WCJ denied Chavez's claim for total disability benefits, and concluded that Ganser's Syndrome was not a compensable form of mental impairment as defined in the Workers' Compensation Act. *Chavez II* at 2 (discussing Section 52–1–24(B), (C)). In a compensation order issued February 11, 1994, the WCJ awarded Chavez forty-eight percent of his maximum weekly benefit for the physical injuries and denied any benefits for the Ganser's Syndrome. *Chavez v. Mountain States Constr.*, N.M. Workers' Compensation Admin., WCA No. 89–03931, Conclusions of Law 7–11, 16 (Feb. 11, 1994) (Griego, WCJ) (compensation order) [hereinafter *Chavez III* ].

[10] Chavez appealed to the Court of Appeals on March 11, 1994. Chavez disputed the denial of benefits from the Ganser's Syndrome but did not contest the award of benefits attributable to his physical injuries. In an opinion to which Judge Donnelly dissented, the Court of Appeals affirmed the WCJ's ruling. *Chavez v. Mountain States Constr.*, 119 N.M. 792, 793, 895 P.2d 1333, 1334 (Ct. App.1995) [hereinafter *Chavez IV* ]. Upon Chavez's appeal, we granted certiorari. *Chavez v. Mountain States Constr.*, 119 N.M. 810, 896 P.2d 490 (1995). We now reverse the determinations of the WCJ and the Court of Appeals.

## II.  STATUTE IN QUESTION

[11] The types of mental impairment that trigger eligibility for workers' compensation are set forth in Section 52–1–24 of the Workers' Compensation Act:

As used in the Workers' Compensation Act [Chapter 52, Article 1 NMSA 1978]:

. . . .

B. "primary mental impairment" means a mental illness arising from an accidental injury arising out of and in the course of employment *when the accidental injury involves no physical injury* and consists of a *psychologically traumatic event that is generally outside of a worker's usual experience* and *would evoke significant symptoms of distress in a worker in similar circumstances,* but is not an event in connection with disciplinary, corrective or job evaluation action or cessation of the worker's employment; and

C. "secondary mental impairment" means a mental illness *resulting from a physical impairment* caused by an accidental injury arising out of and in the course of employment.

(Emphasis added.)

[12] The WCJ, in discussing Chavez's mental impairment, determined that "based on the evidence presented at trial ... Worker suffers from Ganser's Syndrome. Worker is rendered totally disabled by reason of Ganser's Syndrome. The Ganser's Syndrome is causally related to the work accident of April 13, 1989." *Chavez II* at 1. Nevertheless, the WCJ concluded, and the Court of Appeals affirmed, that Chavez's Ganser's Syndrome does not fall within the statutory definitions of either primary or secondary mental impairment. *Id.* at 2; *Chavez III* at 6.

[13] Chavez's malady was found not to be a primary mental impairment for two reasons. First, the WCJ stated and the Majority of the Court of Appeals agreed, without explaining their reasoning, that the truck accident was not a "psychologically traumatic event that is generally outside of a worker's usual experience". Section 52–1–24(B). Further, they found no evidence showing a similar truck accident "would evoke significant symptoms of distress in a worker." *Id.* Apparently, the WCJ and the Court found that the rolling of the truck was not a sufficiently traumatic event to explain Chavez's mental impairment. *See Chavez IV,* 119 N.M. at 793, 795, 895 P.2d at 1334, 1336; *Chavez II* at 2.

[14] Second, the Court stated that Chavez's Ganser's Syndrome was precluded from

being a primary mental impairment by the words "when the accidental injury involves no physical injury." The Court concluded that these words meant that a primary mental impairment occurred only when there is no physical injury whatsoever; the presence of any physical injury removed any accompanying mental impairment from the definition of "primary mental impairment," even if the mental injuries were not causally connected to the physical injuries. *Chavez IV,* 119 N.M. at 794, 795, 895 P.2d at 1335, 1336. The WCJ made no explicit reference to this portion of Section 52–1–24(B) though he suggested that "The Ganser's Syndrome does not derive from a physical impairment caused by an accidental injury, but is rather directly related to the accident of April 13, 1989." *Chavez II* at 1–2.

[15] Additionally, the WCJ and the Court of Appeals concluded that Chavez's Ganser's Syndrome was not a secondary mental impairment because it was not a "mental illness resulting from a physical impairment." Section 52–1–24(C). The medical experts found no physical injury to Chavez's brain. Nor was the syndrome found to have derived from any of the other physical injuries caused by the truck accident. Rather, the syndrome was caused directly by the accident, and was not a byproduct of a physical injury. *Chavez IV,* 119 N.M. at 795, 895 P.2d at 1336; *Chavez II* at 2.

[16] In his summary, the WCJ stated that "[i]t can therefore be seen that Ganser's Syndrome fits neither the definition of primary mental impairment, nor the definition of secondary mental impairment so as to render it a compensable condition under the New Mexico Workers' Compensation Act." *Chavez II* at 2. Thus, despite the conclusions that Chavez's Ganser's Syndrome was caused by the accident and that the syndrome rendered him totally disabled, the WCJ felt compelled to engage in a "legal fiction" that Chavez did "not suffer from Ganser's Syndrome." He stated that he could not do otherwise, because Chavez's mental impairment was removed from consideration by the definitions in Section 52–1–24(B) and (C). The physical injuries thus provided the only basis for establishing disability. If he were to recognize Chavez's total disability, he could base this conclusion only on the physical injuries—a basis not supported by the evidence. Thus, he felt compelled to devise the strained "legal fiction" that Chavez did not have Ganser's Syndrome, and was not totally disabled, in order to justify awarding partial, rather than total, disability benefits for Chavez's impairments. *Chavez II* at 3. The Court of Appeals affirmed the WCJ's award of partial disability. *Chavez IV,* 119 N.M. at 796, 895 P.2d at 1337.

[17] In arguments to this Court, the parties initially focused on the Legislature's intentions in describing a primary mental impairment as a "mental illness ... when the accidental injury involves no physical injury." Section 52–1–24(B). However, Mountain States also argued that we should affirm the WCJ's conclusion that the Ganser's Syndrome did not result from "a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances." *Id.* We address both issues.

[18] The record supports the conclusion that Chavez did not suffer from a secondary mental impairment. But we do not find persuasive the reasoning of the WCJ and the majority opinion of the Court of Appeals that his affliction is not a primary mental impairment. We conclude that Chavez's Ganser's Syndrome is a primary mental impairment and that he should be awarded compensation benefits for total disability.

### III. STANDARDS OF REVIEW

[19] We review this case under the standards governing judicial review of agency decisions. *See generally Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n,* 120 N.M. 579, 582, 904 P.2d 28, 31 (1995). "When reviewing administrative agency decisions courts will begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Id.*

[20] We will generally defer to an agency's factual determination, especially if

the factual question concerns matters that fall within the agency's area of specialization. *Id.* at 583, 904 P.2d at 32. "When reviewing findings of fact made by an administrative agency we apply a whole record standard of review. This means that we look not only at the evidence that is favorable, but also evidence that is unfavorable to the agency's determination." *Fitzhugh v. New Mexico Dep't of Labor,* 122 N.M. 173, 180, 922 P.2d 555, 562 (1996) (citations omitted). The factual decision of the agency will be affirmed if it is supported by substantial evidence in the whole record. *Id.*

[21] When an agency addresses a question of law by construing or applying a particular statute, courts will grant some deference to legal determinations that fall within agency expertise. *Morningstar,* 120 N.M. at 583, 904 P.2d at 32. However, "it is the function of the courts to interpret the law," and courts are in no way bound by the agency's legal interpretation. *Id.*

[22] In this case we accept the WCJ's factual conclusions that Chavez suffered from Ganser's Syndrome, that the mental impairment was causally related to the truck accident, and that this mental impairment renders him totally disabled. *See Chavez II* at 1 (quoted by *Chavez IV,* 119 N.M. at 794, 895 P.2d at 1335). We also accept the factual conclusion that Chavez's mental illness is not the byproduct of a physical injury. This fact supports the legal conclusion that the syndrome is not a secondary mental impairment. *Chavez IV,* 119 N.M. at 795, 895 P.2d at 1336; *Chavez II* at 2. No other adjudicator was in a better position than the WCJ to observe and evaluate the evidence regarding Chavez's disabilities. The WCJ's factual conclusions are supported by substantial evidence in the record as a whole.

[23] Thus, in this case, we are faced with but a single question of law: whether Chavez's Ganser's Syndrome falls within the definition of "primary mental impairment." Mountain States urges us to apply a plain meaning rule in interpreting Section 52–1–24. Under the plain meaning rule, when the language of a statute is clear and unambiguous, we must give effect to that language and refrain from extrapolating unexpressed meanings. *State v. Jonathan M.,* 109 N.M. 789, 790, 791 P.2d 64, 65 (1990). *See generally State ex rel. Helman v. Gallegos,* 117 N.M. 346, 351–54, 871 P.2d 1352, 1357–60 (1994) (extensive discussion of the plain meaning rule). Mountain States argues that, because Chavez suffered physical injuries, the literal language of Section 52–1–24(B) precludes him from claiming he has a primary mental impairment, since such an impairment occurs only "when the accidental injury involves no physical injury." The Court of Appeals applied the plain meaning rule when it concluded that in this case "the definitions of mental impairment are clear, so we do not look to any other source to determine legislative intent." *Chavez IV,* 119 N.M. at 795–96, 895 P.2d at 1336–37.

[24] However, the plain meaning rule is not absolute, and has been modified by several rules of statutory construction. *Cummings v. X–Ray Assocs.,* 121 N.M. 821, 834, 918 P.2d 1321, 1334 (1996) (stating that the plain meaning "rule does not require a mechanical, literal interpretation of the statutory language"). Our purpose is to effectuate the intent of the Legislature and "[w]e will not rest our conclusions upon the plain meaning of the language if the intention of the legislature suggests a meaning different from that suggested by the literal language of the law." *Id.* We will avoid any literal interpretation that leads to an absurd or unreasonable result and threatens to "convict the legislature of imbecility." *Cortesy v. Territory,* 6 N.M. 682, 690–91, 30 P. 947, 949 (1892). We will apply these standards in evaluating the language of Section 52–1–24.

## IV. PRIMARY MENTAL IMPAIRMENT

[25] New Mexico appellate courts have previously recognized that the provisions of the Workers' Compensation Act are imprecise. *See Coslett v. Third St. Grocery,* 117 N.M. 727, 729, 876 P.2d 656, 658 (Ct.App.) ("[I]mprecision in the language of New Mexico's workers' compensation laws is hardly unprecedented."), *cert. denied,* 117 N.M. 802, 877 P.2d 1105 (1994). Section 52–1–24 is no exception to this ambiguity of language. This serves as a warning that the plain lan-

guage rule may not be the best approach to interpreting this statute. In our analysis we will examine and describe the various elements of the statute to clarify their meaning.

[26] Section 52–1–24(B) sets forth a series of criteria that must be present before a mental illness qualifies as a "primary mental impairment" under the Worker's Compensation Act. We identify three such criteria. These criteria—though not sequentially presented by the statute—suggest a logical sequence; one criterion must be factually established before the next can be addressed. We will follow this three-part sequence in discussing the application of the statute to Chavez's Ganser's Syndrome.

[27] First, the worker must be involved in an "an accidental injury arising out of and in the course of employment." Section 52–1–24(B). The meaning of this phrase is amplified by NMSA 1978, § 52–1–28(A) (Repl. Pamp.1991), which requires the accident to be "reasonably incident to [the worker's] employment" and the disability to be "a natural and direct result of the accident." Since we have accepted the WCJ's conclusions regarding the causal link between the accident and the Ganser's syndrome, this requirement is not at issue in this case.

[28] Second, the nature of the "accidental injury" is established. It must consist "of a psychologically traumatic event." Section 52–1–24(B). This language seems to confound the accidental event with the resultant injury. We interpret this provision to mean that the cause of the "accidental injury"—the accident itself—must be a psychologically traumatic event. This psychologically traumatic event possesses two qualities: it must be "generally outside of a worker's usual experience" and it must be such that it "would evoke significant symptoms of distress in a worker in similar circumstances." *Id.* Moreover the traumatic event has several limitations; it cannot be connected "with disciplinary, corrective or job evaluation action or cessation of the worker's employment." *Id.*

[29] Third, the effect upon the worker of the traumatic event is evaluated. The accidental injury has two express aspects: it

must be "a mental illness" and it can involve "no physical injury." *Id.*

[30] To summarize, 1) the worker must establish a work-related accident; 2) the accident must be a traumatic event; and 3) the traumatic event must cause a mental injury that involves no physical injury. As stated above, there is no dispute concerning the first criterion. The remainder of this opinion will address the other two criteria in Section 52–1–24(B): the traumatic event and the nature of the injury.

A.   Traumatic Event

[31] This case does not present "a psychologically traumatic event" that was connected "with disciplinary, corrective or job evaluation action or cessation of the worker's employment." *Id.* We address only whether, as a matter of law, the truck accident was "outside of a worker's usual experience" and whether a similar accident would "evoke significant symptoms of distress in a worker." *Id.*

1.   "generally outside of a worker's usual experience"

[32] It is not self-evident what sorts of events fall outside a worker's usual experience. The identity of the "worker" in the phrase "a worker's usual experience" is rather cryptic. The Legislature's use, in this phrase, of the indefinite article "a" rather than the definite "the" suggests an intent to give a broad meaning to "worker." *See Collado v. City of Albuquerque,* 120 N.M. 608, 613, 904 P.2d 57, 62 (Ct.App.1995). Thus, the phrase addresses a larger class of workers than the single individual who is applying for benefits; we are not limited to questioning whether the truck accident was outside of Chavez's "usual experience." *See id.*

[33] How large a class of workers does this statute concern? The phrase "a worker's usual experience" can suggest the experiences of "all workers in the working world, regardless of occupation or employer." *Id.* On the other hand it may apply to a more limited class of workers, those who are employed in the same or similar jobs involving the same or similar responsibilities as the

worker who is claiming benefits. *See id.* We conclude that the Legislature most likely intended the second of these possibilities. An event that is psychologically traumatic in one profession might not be so in another. *Jensen v. New Mexico State Police,* 109 N.M. 626, 629, 788 P.2d 382, 385 (Ct.App.), *cert. denied,* 109 N.M. 563, 787 P.2d 1246 (1990). On the other hand, there are no professions, even those that routinely involve great stress, that do not, as a matter of law, expose workers to psychologically traumatic events that may warrant compensation for mental injuries. *See Collado,* 120 N.M. at 614, 904 P.2d at 63 (discussing traumatic events experienced by a worker in the emergency medical profession). Thus, establishing whether an experience is "generally outside of a worker's usual experience" requires a comparison of the worker's psychologically traumatic event with the events generally experienced by other workers whose jobs are the same or similar to that of the injured worker. *Id.* at 613–14, 904 P.2d at 62–63.

[34] In the present case, Chavez suffered serious physical injuries from the truck accident. It is axiomatic that such an event is outside of almost any worker's usual experience. It is difficult to imagine a profession in which rolling a fully loaded dump truck would be within a worker's usual experience. Such an event is certainly not an ordinary part of the working life of a truck driver for a construction company. We conclude from the findings of fact supported by the whole record that, as a matter of law, the accident was "outside of a worker's usual experience" within the meaning of Section 52–1–24(B). The WCJ and the Majority of the Court of Appeals erred in stating otherwise.

#### 2. "would evoke significant symptoms of distress in a worker in similar circumstances"

[35] By requiring the traumatic event to be one that "would evoke significant symptoms of distress in a worker in similar circumstances," the Legislature established an objective standard under which, as a matter of law, the trauma of a specific worker may be evaluated. *Jensen,* 109 N.M. at 628,

788 P.2d at 384. As stated above, the "worker" in this statute is one who is employed in a job that is the same or similar to the one held by the worker who is claiming benefits. Thus, in this case we ask whether a worker whose employment responsibilities were similar to Chavez's could possibly suffer "significant symptoms of distress" in an accident similar to Chavez's truck accident.

[36] It will be useful to examine the types of traumatic events the Legislature envisioned as evoking "significant symptoms of distress in a worker." By excluding trauma connected with disciplinary actions, job evaluation, or termination of employment, the Legislature intended to limit primary mental impairment to mental illnesses caused by sudden, emotional, catastrophic events. *See* § 52–1–24(B). Thus compensation is denied for mental injuries that result from minor everyday disturbances or from illnesses that are caused by the incremental accumulation of stress over a period of time. *See Jensen,* 109 N.M. at 629, 788 P.2d at 385.

[37] The American Psychiatric Association has published lists of sudden, emotional, catastrophic events that can produce psychiatric disorders. These include: sexual assault, physical attack, robbery, mugging, being kidnapped or taken hostage, terrorist attack, military combat, floods, earthquakes, airplane crashes, large fires, bombings, torture, death camps, being diagnosed with a life-threatening illness, and, pertinent to this case, severe automobile accidents. *See DSM–IV, supra,* at 424; American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 236 (3d ed.1980) (quoted by *Jensen,* 109 N.M. at 629, 788 P.2d at 385, and by *Collado,* 120 N.M. at 614, 904 P.2d at 63).

[38] Even if the American Psychiatric Association list did not include "severe automobile accidents," it is self-evident that for almost any person—and not just truck drivers for construction companies—rolling a loaded dump truck would be traumatic. Moreover, evidence in the record suggests that mental impairments like Ganser's Syndrome are a possible consequence of such a traumatic event. As Judge Donnelly stated in his dissent:

It is uncontradicted that Worker was in a serious motor vehicle accident which resulted in serious physical and mental injuries. This certainly constitutes sufficient evidence to give rise to a reasonable inference that others may sustain physical and mental injuries if they experienced a similar accident.

*Chavez IV,* 119 N.M. at 798, 895 P.2d at 1339 (Donnelly, J., dissenting). We conclude from the findings of fact supported by the whole record that, as a matter of law, under Section 52–1–24(B), the accident "would evoke significant symptoms of distress in a worker in similar circumstances." A contrary suggestion by the WCJ and the Majority of the Court of Appeals is erroneous.

B. The Nature of the Mental Injury

[39] The third criterion under the definition of "primary mental impairment" addresses the effect upon the worker of the traumatic event. The worker's injury must be "a mental illness," it can involve "no physical injury," and it must arise from the traumatic event. Section 52–1–24(B).

[40] As we have already stated, the record as a whole substantially supports the WCJ's factual conclusions that Chavez "suffers from Ganser's Syndrome," and that "[t]he Ganser's Syndrome is causally related to the work accident of April 13, 1989." *Chavez II* at 1. The record also supports the WCJ's conclusion that, even though Chavez received physical injuries, his "Ganser's Syndrome is a psychological condition, and is not related to a physical malady such as dementia or organic brain injury." *Id.* Under the third criterion, we need only address whether Chavez's physical injuries prevent his Ganser's Syndrome from being classified as a primary mental impairment, when such an impairment can involve "no physical injury." *See* § 52–1–24(B).

[41] The Majority of the Court of Appeals stated that under the plain meaning rule Chavez cannot claim his "accidental injury involves no physical injury." As the Court stated, "Under Section 52–1–24(B), a worker can recover for primary mental impairment only 'when the accidental injury involves no physical injury.' The present

case clearly involved a physical injury, for which compensation benefits were awarded. Worker's injury therefore does not fall within the definition of primary mental impairment." *Chavez IV,* 119 N.M. at 795, 895 P.2d at 1336; *see also Chavez II* at 1–2 (same idea). This interpretation is unreasonable. It leads to absurd results that would be impossible to justify.

[42] We will look beyond the plain meaning of statutory language if such an interpretation leads to an absurd result. *See Cortesy,* 6 N.M. at 690–91, 30 P. at 949. As Judge Donnelly stated in his dissent,

the interpretation applied by the majority means that if Worker is involved in a work-related motor vehicle accident which results in severe psychological impairment that was not caused by a physical injury, no recovery is permitted if Worker also received any physical injury in the same accident, even a minor physical injury.

*Chavez IV,* 119 N.M. at 797, 895 P.2d at 1338 (Donnelly, J., dissenting). Thus if Chavez had escaped from the truck accident without a scratch, his resulting Ganser's Syndrome would be compensable as a primary mental impairment. However, because he suffered head injuries requiring twenty-eight stitches and the rotator-cuff injury resulting in forty-eight percent impairment, his accompanying mental impairment is not compensable. *See id.* at 797–98, 895 P.2d at 1338–39 (discussing the incongruity of the Majority's interpretation of Section 52–1–24(B)). It is impossible to imagine a legislative purpose behind such an interpretation.

[43] The phrase "when the accidental injury involves no physical injury" means that the accident, or traumatic event, rather than the physical injury, directly caused a mental injury. This phrase is meant to broaden the statute, not to make it narrower. It shows the Legislature wanted to make certain that mental impairment was covered by the Act *even if* there were no physical injury. The phrase does not mean *only when* there is no physical injury. It refers to a mental injury that is independent of and distinguishable from any physical injury that may also have been caused by the accident. The intent of the statute is that the mental

impairment should be considered *in addition to* any physical impairment if that physical impairment has no causal relationship to the mental impairment. We overrule any previous suggestion by New Mexico courts to the contrary. *See Fitzgerald v. Open Hands,* 115 N.M. 210, 213, 848 P.2d 1137, 1140 (Ct. App.1993) (distinguishing between primary and secondary mental impairments under Section 52–1–24(B), and stating in passing that the worker in that case "never suffered a primary mental impairment because that, by definition, is a mental impairment without physical injury").

[44] If there is a causal relationship between the mental impairment and the physical impairment, then the mental illness is a "secondary mental impairment" under Section 52–1–24(C). In order to harmonize both mental impairment definitions to produce a common-sense result, the phrase "where there is no physical injury" necessarily means "where no physical injury caused the mental impairment." Conversely, secondary mental impairment occurs "where physical injury did cause the mental impairment."

Thus, a "primary mental impairment" is a mental disability that satisfies all the criteria of Section 52–1–24(B) and occurs as a result of the traumatic event *regardless of* the presence of any physical injury. *See Chavez IV,* 119 N.M. at 797, 895 P.2d at 1338 (Donnelly, J., dissenting).

## V. CONCLUSION

[45] For the foregoing reasons we reverse the decision of the Court of Appeals and direct that Chavez be awarded compensation for Ganser's Syndrome as a primary mental impairment under Section 52–1–24(B).

[46] **IT IS SO ORDERED.**

RANSOM and MINZNER, JJ., concur.