**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2013-NMCA-067

Filing Date: April 24, 2013

Docket No. 31,041

NEW MEXICO BOARD OF LICENSURE
FOR PROFESSIONAL ENGINEERS AND
PROFESSIONAL SURVEYORS,

      Petitioner-Appellant,

v.

WILLIAM M. TURNER,

      Respondent-Appellee.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Valerie A. Huling, District Judge

Gary K. King, Attorney General
Santa Fe, NM
Mary H. Smith, Assistant Attorney General
Albuquerque, NM

for Appellant

Martin E. Threet and Associates
Martin E. Threet
Albuquerque, NM

for Appellee

## OPINION

**HANISEE, Judge.**

**{1}**    The New Mexico Board of Licensure for Professional Engineers and Professional Surveyors (the Board) appeals the district court's reversal of the Board's decision finding that William Turner practiced engineering without a license in violation of the Engineering and Surveying Practice Act (ESPA). The Board argues that the district court erred by (1)

1

determining that the Board's interpretation of the ESPA improperly infringed on Turner's free speech rights; (2) reweighing the evidence in the administrative record and substituting its judgment for that of the Board; and (3) making its own findings of fact. For reasons explained below, we affirm the district court.

## I.      BACKGROUND

**{2}**      Turner is a hydrologist, with a Ph.D in geology-hydrology, and was an elected member of the Middle Rio Grande Conservancy District (MRGCD) Board of Directors in 2007. Although Turner has taken civil engineering courses relating to open channel flow, he is not a licensed engineer. In 2007, at the request of one of his constituents, Turner conducted an inspection of MRGCD irrigation ditches to substantiate the damage caused by the placement of demolition and construction waste, which Turner referred to as "un-engineered rip-rap," into the ditches. For ease of reference, we hereafter refer to the demolition and construction waste as un-engineered rip-rap[1] throughout this Opinion.

**{3}**      Upon completion of his investigation, which focused mainly on the Pajarito Ditch in Bernalillo County, Turner prepared and presented a report at the February 27, 2007 MRGCD Board of Directors meeting which expressed his concerns regarding the condition of MRGCD ditches. The report was titled "The Consequences of Using Un-Engineered Rip-Rap in MRGCD Ditches and Recommendations." The report criticized MRGCD's method of using un-engineered rip-rap in ditches to prevent erosion because "while it may be cheap, [its use] leads to some extremely dire consequences that affect public safety and the general welfare." Turner applied the Manning Equation, a civil engineering mathematical formula, to compare the conveyance capacity of ditches containing un-engineered rip-rap to that of ditches with fine sand bottoms. In concluding that water flow is more impeded in rough than in smooth channels, he asserted that MRGCD's use of un-engineered rip-rap in ditches resulted in the "significant reduction in ditch conveyance capacity[ which] means that farmers are unable to obtain adequate water supplies." Turner also cautioned that the reduction of conveyance capacity could also lead to dangerous flooding in ditch levees and subsequent bank erosion that could lead to failure. The report particularly criticized MRGCD's Chief Engineer Subhas Shah, who, according to Turner, directed the un-engineered rip-rap to be deposited in the ditches.

**{4}**      Turner reiterated that he was not an engineer multiple times during the MRGCD Board of Directors meeting, when giving and in response to comments about his presentation. In addition, Turner insisted that MRGCD should hire a registered engineer to deal with the issues highlighted in his report. At the end of Turner's report, he stated that

---

[1]The term "rip[-]rap" is defined as "a foundation or sustaining wall of stones or chunks of concrete thrown together without order . . . [or] a layer of this or similar material on an embankment slope to prevent erosion." Merriam-Webster's Collegiate Dictionary 1011 (10th ed. 2010).

he "is not a registered professional engineer [and that t]his report should be reviewed by a [r]egistered [p]rofessional [e]ngineer."

**{5}** Dennis Domrzalski, a contract employee of MRGCD, thereafter filed a complaint against Turner with the Board, alleging that Turner engaged in the forbidden practice of engineering without a license when he wrote and presented his report at the MRGCD Board of Directors meeting. In a letter responding to the complaint, Turner asserted that he "was never paid for the services, nor were the services ever considered anything more than [an] opinion by a board member for a reason to obtain a[] licensed [p]rofessional [e]ngineer's services."

**{6}** Nonetheless, the Board's professional engineering committee conducted an administrative hearing[2] on December 16, 2009, nearly three years after Turner's February 2007 presentation to the MRGCD Board of Directors. At the proceeding, the Board was presented with testimony and documentary evidence from the Board's prosecutor and Turner. On February 26, 2010, the Board issued its Decision and Order containing its findings of fact and conclusions of law. The Board concluded that Turner had in fact practiced engineering without a license, in violation of the ESPA, NMSA 1978, Sections 61-23-2 (2003) and -3 (2005), "by his investigation and evaluation of the planning and design of 'engineering works and systems'—MRGCD ditches—described in his . . . [r]eport . . . and his presentation of that [r]eport to the MRGCD Board of Directors."

**{7}** The Board's decision explained that Turner's "repeated use of the terms 'engineered' and 'engineering' in his [r]eport, as used in the context of his investigation and evaluation of the 'un-engineered rip-rap'. . ., indicates that [Turner] engag[ed] in the 'practice of engineering' as defined by Section 61-23-3(E)." The Board stated that Turner's report "constitutes 'engineering' insofar as it applied the Manning Equation in his investigation and evaluation of the Pajarito Ditch to conclude that there are consequences of using 'un-engineered' rip-rap in MRGCD ditches." The Board's decision went on to state that Turner engaged in the practice of engineering "when he applied engineering principles, equations and concepts to investigate and evaluate the flow of water in MRGCD ditches, and when he compared 'A Smooth Well-Engineered Ditch' with 'A Badly or Completely Non-Engineered Rip-Rapped Ditch.' " Pursuant to NMSA 1978, Section 61-23-10(E) (2005) (stating that the board has exclusive authority over practice disputes), the Board ordered Turner to cease and desist from any further unlicensed practice of engineering, pay a $2,500 civil penalty, and pay an additional administrative hearing cost in the amount of $2,670.93.

**{8}** Turner timely appealed the Board's decision to the district court. In its appellate

---

[2]*See* NMSA 1978, § 61-23-23.1(A) (2003) (amended 2012) ("The [B]oard may investigate and initiate a hearing on a complaint against a person who does not have a license, who is not exempt from the [ESPA] and who acts in the capacity of a professional engineer within the meaning of the [ESPA].").

3

capacity, the district court determined that the Board's decision was not supported by substantial evidence. The district court concluded that "Turner's conduct in evaluating an engineering issue, performing engineering calculations, writing his conclusions, and presenting them publicly, cannot constitute the practice of engineering without a license." The district court explained that the Board's actions violated Turner's First Amendment right to freedom of speech, adding that "[i]f Section 61-23-10(E) authorizes the [] Board to order Turner to cease and desist from observing an engineering system, considering possible problems through calculations and analysis, writing his observations and conclusions, and speaking public[ly] on these issues, then Section 61-23-10(E) would be unconstitutional." The Board now petitions for review of the district court's reversal. We granted the Board's petition for certiorari under Rule 12-505(D)(2)(d)(iii)-(iv) NMRA (stating that we may grant such a writ when a case presents significant questions of constitutional law or issues of substantial public interest).

## II. DISCUSSION

**{9}** The Board asserts that the district court erred by determining that the Board's application of Sections 61-23-2, -3, and -10(E) to these facts violated the First Amendment by reweighing the evidence in the administrative record and substituting its judgment for that of the Board, and by making its own findings of fact. We apply the same statutorily mandated standard of review as the district court in reviewing administrative decisions. *Miller v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 2008-NMCA-124, ¶ 16, 144 N.M. 841, 192 P.3d 1218. "The district court may reverse an administrative decision only if it determines that the administrative entity acted fraudulently, arbitrarily, or capriciously; if the decision was not supported by substantial evidence in the whole record; or if the entity did not act in accordance with the law." *Id.* (alterations, internal quotation marks, and citation omitted). This Court "will conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806. "Although a court will generally defer to an agency's interpretation of an ambiguous statute or regulation that it is charged with administering, it is the function of courts to interpret the law in a manner consistent with the legislative intent." *Howell v. Marto Elec.*, 2006-NMCA-154, ¶ 16, 140 N.M. 737, 148 P.3d 823.

### A. The District Court Did Not Err in Determining that the Board's Decision Violated the First Amendment

**{10}** The Board construed Turner's report and presentation to be a violation of Section 61-23-2, which states:

> The [L]egislature declares that it is a matter of public safety, interest and concern that the practices of engineering and surveying merit and receive the confidence of the public and that only qualified persons be permitted to

engage in the practices of engineering and surveying. In order to safeguard life, health and property and to promote the public welfare, any person in either public or private capacity practicing or offering to practice engineering or surveying shall be required to submit evidence that he is qualified to so practice and shall be licensed as provided in the [ESPA]. It is unlawful for any person to practice, offer to practice, engage in the business, act in the capacity of, advertise or use in connection with his name or otherwise assume, use or advertise any title or description tending to convey the impression that he is a professional, licensed engineer or surveyor unless that person is licensed or exempt under the provisions of the [ESPA.]

In reversing the Board's decision, the district court noted the breadth of the ESPA's definition of the "practice of engineering":

"[E]ngineering", "practice of engineering" or "engineering practice" means any creative or engineering work that requires engineering education, training and experience in the application of special knowledge of the mathematical, physical and engineering sciences to such creative work as consultation, investigation, forensic investigation, evaluation, planning and design of engineering works and systems, expert technical testimony, engineering studies and the review of construction for the purpose of assuring substantial compliance with drawings and specifications; any of which embrace such creative work, either public or private, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects and industrial or consumer products or equipment of a mechanical, electrical, hydraulic, chemical, pneumatic, environmental or thermal nature, insofar as they involve safeguarding life, health or property, and including such other professional services as may be necessary to the planning, progress and completion of any engineering work. The "practice of engineering" may include the use of photogrammetric methods to derive topographical and other data. The "practice of engineering" does not include responsibility for the supervision of construction, site conditions, operations, equipment, personnel or the maintenance of safety in the work place[.]

Section 61-23-3(E). With this broad definition in mind, the district court found that the Board's interpretation and enforcement of Section 61-23-2 were unconstitutional.

**{11}** After reviewing the record, we agree that the Board's interpretation and application of the statute were unconstitutional. Despite the definitionally expansive reach of "practice of engineering," the Board had the obligation to apply Section 61-23-2 in a constitutional manner. *See State v. Wade*, 100 N.M. 152, 154, 667 P.2d 459, 461 (Ct. App. 1983) (stating that courts always strive to construe a statute, "if possible, so that it will be constitutional"); *see also State v. Morley*, 63 N.M. 267, 271, 317 P.2d 317, 319 (1957) ("Where two constructions may be reasonably adopted, one of which will render an act wholly nugatory,

and the other will make it effectual, the latter should be adopted." (internal quotation marks and citation omitted)).

**{12}** In evaluating the constitutionality of the Board's application of this professional regulation, we apply the four-part *O'Brien* test. *State v. Ongley*, 118 N.M. 431, 433, 882 P.2d 22, 24 (Ct. App. 1994). Under the *O'Brien* test, the law will be upheld as constitutional if it satisfies each of the following elements:

> [1] if it is within the constitutional power[s] of the [g]overnment; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Ongley*, 118 N.M. at 433, 882 P.2d at 24 (alterations in original) (internal quotation marks and citation omitted) (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

**{13}** Consistent with the district court's ultimate determination, the fourth prong of the *O'Brien* test is decisive in this case. According to Section 61-23-2, the government's stated interest in implementing this statute is to regulate the practice of engineering in order to "safeguard life, health and property and to promote the public welfare." Section 61-23-3 was effectuated to govern the activities of persons who engage in work and provide professional services in the field of engineering. With this in mind, "the true test [to satisfy the fourth prong is] whether the restrictions imposed on free expression by the [ESPA] are greater than necessary to further the State's interest in ensuring that only qualified persons practice [engineering] within its borders." *Ongley*, 118 N.M. at 434, 882 P.2d at 25.

**{14}** We first emphasize that the Board's enforcement of this statute against Turner for his actions in investigating, writing, and presenting a report on the un-engineered rip-rap fails to, in any meaningful way, further the objective of the ESPA. We underscore that Turner investigated and reported on the rip-rap issue at a public meeting of the MRGCD Board of Directors (on which Turner had been elected to sit), at the behest of a constituent, and that during the meeting, he repeatedly disclaimed any status as an engineer and instead asked for the Board of Directors to seek evaluation by a licensed engineer. By restricting speech by any person—including an elected official of a board concerned with the very subject of engineering[3]—under circumstances where the speaker expressly refuses to offer the services of an engineer, does not represent himself to be an engineer, and does not speak in a way that would cause the public to rely on him as an engineer, the Board failed to act in a manner that advances the objective of the statute. Plainly, life, health, property, and the public's welfare

---

[3]NMSA 1978, Section 73-14-46 (1927) expressly permits a conservancy board to make examinations of "stream flow and other scientific and engineering subjects as are necessary and proper for the purpose of the district[,] and they may issue reports thereon."

were not jeopardized in the least by Turner's discussion of this engineering issue as a concerned MRGCD Board of Directors' member in a public forum.

{15}    At its worst, the Board's interpretation of Section 61-23-2 results in a targeted topical elimination of Turner's right to freedom of speech: it punishes Turner for participating in public discourse about technical aspects of engineering matters related to the ongoing management of water in New Mexico. Furthermore, the Board's statutory construction prophylactically eliminates alternative channels of communication for Turner to express such ideas. *See Ongley*, 118 N.M. at 434, 882 P.2d at 25 (holding that a statute prohibiting the practice of medicine without a license did not violate the defendant's right to freedom of speech, where the statute left "open numerous alternative channels of communication for [the d]efendant to express his ideas and opinions concerning effective treatment for various diseases or conditions"). In fact, the Board went so far as to order Turner to globally refrain from further dissemination of his concerns, the results of his investigation, or his paper in any manner or place. Yet the Board has no proprietary interest in the words and concepts of the general field of engineering when professional work is not afoot. Such a broad-brushed interpretation of Section 61-23-2 results in excessively burdensome restrictions on speech that are unnecessary to protect the public from the unlicensed practice of engineering.

{16}    We acknowledge that Turner's investigative work and the actual work involved in drafting the report can be viewed differently from the pure speech of his presentation to the MRGCD Board of Directors. His investigation and writing involved to some degree the use of engineering concepts. We conclude nevertheless that this activity is protected by the First Amendment also. The investigation, written report, and presentation to the MRGCD Board of Directors comprise a single piece performed by Turner at the behest of a constituent and in his capacity as an MRGCD board member. Without the ability to use words and ideas that have use in the field of engineering, Turner's investigation and report would have had nothing of substance to present at the MRGCD Board of Directors meeting in regard to his belief that un-engineered rip-rap in the ditches was impeding water flow. It bears repeating that the investigation was conducted and the report was produced for the sole purpose of presentation to the Board for its consideration. Turner had no client, engaged in no business, nor acted in any capacity in which he could reasonably be confused with an engineer. *See* Section 61-23-2.

{17}    The genesis and purpose of Turner's actions distinguish them from the acts of the defendant in *Ongley*. In *Ongley*, the defendant was not convicted of violating the Medical Practice Act for delivering a lecture on injection techniques. Rather, his conviction was based on his act of giving injections to patients at the seminar. *Ongley*, 118 N.M. at 432, 882 P.2d at 23. There, this Court concluded that conduct involving actual patients was subject to reasonable regulation because it went to the heart of the state's interest inherent in the regulation of the practice of medicine. *Id.* at 434, 882 P.2d at 25. Here, the investigation and report were equivalent to the preparation necessary for and leading up to the lecture which was recognized as protected conduct in *Ongley*. Moreover, the Board's construction of Section 61-23-2 with regard to the investigatory aspect of Turner's actions results in

7

excessively burdensome restrictions on speech in this context that are unnecessary to protect the public from the unlicensed practice of engineering. Absent any indication that the investigation and report were intended for use in any context other than as support for Turner's presentation to the MRGCD Board, they are protected expressive conduct.

**{18}** We therefore affirm the district court's reversal because the Board's overtly and unreasonably open-ended interpretation of Section 61-23-2 resulted in constitutionally impermissible restrictions on Turner's speech.

**B.      The District Court Adhered to the Proper Standard of Review and Did Not Engage in Fact Finding**

**{19}** The Board opines that the district court "elected to disregard the Board's 'fact-finding competence' and instead reevaluated the evidence to support a determination contrary to that made by the Board." The Board contends that the district court failed to describe how "the administrative record as a whole did not support the Board's [d]ecision." The Board asserts that the district court did not view the "evidence in the light most favorable to the Board's [d]ecision, and improperly ignored the Board's expertise in engineering." The Board also argues that the district court made factual findings by concluding that Turner's conduct could not constitute practicing engineering without a license. We disagree.

**{20}** The district court concluded that the Board's application of Section 61-23-2 to this case was unconstitutional. In its memorandum opinion, the district court noted the facts as they were stated by the Board in its written decision. The district court reversed based upon its legal conclusion that the Board's application of the law to the facts it found was unconstitutional. As such, the district court's decision is best characterized as a conclusion that the Board did not act in accordance with the law. *See Miller*, 2008-NMCA-124, ¶ 16 ("The district court may reverse an administrative decision . . . if it determines that . . . the entity did not act in accordance with the law." (second alteration, internal quotation marks, and citation omitted)). We conclude that the district court's decision was based in law, required no fact finding or reevaluation  of evidence, and was not a product of improper review.

**{21}** Although the Board asserts that *only* the Board can determine whether a person's behavior falls within the statutory definition of "the practice of engineering," this assertion is incorrect. "When an agency addresses a question of law by construing or applying a particular statute, courts will grant some deference to legal determinations that fall within agency expertise." *Chavez v. Mountain States Constructors*, 1996-NMSC-070, ¶ 21, 122 N.M. 579, 929 P.2d 971. But our Supreme Court explicitly cautions that the deference afforded to an administrative body's legal determinations "is not absolute." *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-032, ¶ 10, 140 N.M. 6, 139 P.3d 166. Courts "will reject an agency's interpretation even of an ambiguous statute if it appears unreasonable or inconsistent with legislative intent." *Id*. "[I]t

is the function of the courts to interpret the law, and courts are in no way bound by the agency's legal interpretation." *Rio Grande Chapter of Sierra Club*, 2003-NMSC-005, ¶ 13 (internal quotation marks and citation omitted). "[A] court may [even] substitute its own interpretation of the applicable law for that of the [administrative body]." *Id.* We too "disagree with [the Board's] characterization of our review function." *Id.* Here, the district court properly exercised its power of judicial review to reverse the Board's decision based on its correct interpretation of Section 61-23-2 and the United States Constitution.

**{22}** Thus, we conclude that the district court did not engage in fact finding, reevaluating evidence, or improper appellate review. The district court's reversal was based upon the Board's failure to adhere to the constitution in applying Section 61-23-2.

## III.  CONCLUSION

**{23}** Based on the foregoing, we conclude the district court did not err. We affirm.

**{24}  IT IS SO ORDERED.**

 

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Chief Judge**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *N.M. Bd. of Licensure v. Turner*, No. 31,041**

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Appeal
Judicial Review
Legislative Intent
Scope of Review

**APPEAL AND ERROR**
Standard of Review

**CONSTITUTIONAL LAW**
Freedom of Speech

**GOVERNMENT**

Licensing
Water and Water Systems

**STATUTES**
Interpretation
Legislative Intent
Rules of Construction